## UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF LOUISIANA

SCOTTSDALE INSURANCE
COMPANY

          vs.

SCOTT G. JONES, ESQ.,
HULSE AND WANEK, PLC
AND XYZ INSURANCE
COMPANY

CIVIL ACTION NO.  00225

SECTION "F"

MAGISTRATE DIVISION (4)

*************************************************************
### SCOTTSDALE INSURANCE COMPANY'S MOTION FOR
### SUMMARY JUDGMENT THAT FILING OF FALSE AFFIDAVIT IS
### LEGAL MALPRACTICE AS A MATTER OF LAW

**NOW COMES** Scottsdale Insurance Company (hereinafter "Scottsdale"), through undersigned counsel, to move the Court, pursuant to F.R.C.P. 56, to find that there exist no genuine issues of material fact and that plaintiff is entitled to judgment regarding defendants' liability as a matter of law.

The ground for plaintiff's Motion for Summary Judgment is that on or about September 22, 1999, defendants' drafted and induced a client, Mr. Van Lauren McCahill to sign, an affidavit which defendants filed before the Civil District Court in Orleans Parish.  Defendant, Mr. Scott Jones, also notarized the affidavit.  Defendants submitted the affidavit to oppose the State of Louisiana's Exception of Prescription in the medical malpractice action which preceded the present case.  The affidavit which defendants drafted, induced Mr. McCahill to sign and notarized was materially false and designed to protect the interests of defendants, as opposed to those of their client,

Scottsdale.  Scottsdale therefore moves the Court to find that by filing a false affidavit to protect their own interests, defendants committed legal malpractice as a matter of law.

Respectfully submitted,

Mark L. Ross, Bar No. 11477
Attorney for Scottsdale
Insurance Company
600 Jefferson Street, Suite 501
Lafayette, Louisiana  70501
Telephone  (337) 266-2345
Facsimile: (337) 266-2163

## LR 5.3 CERTIFICATE OF SERVICE

I certify that on this 8th day of January, 2001 , a copy of the foregoing pleading has either been hand delivered or mailed to all counsel of record by depositing same in the United States mail, postage prepaid and properly addressed.

MARK L. ROSS

# UNITED STATES DISTRICT COURT FOR
# THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **SCOTTSDALE INSURANCE COMPANY** | **CIVIL ACTION NO.  00225** |
| **vs.** | **SECTION "F"** |
| **SCOTT G. JONES, ESQ., HULSE AND WANEK, PLC AND XYZ INSURANCE COMPANY** | **MAGISTRATE DIVISION (4)** |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## SCOTTSDALE INSURANCE COMPANY'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON ISSUE OF LIABLITY

**NOW COMES** Scottsdale Insurance Company (hereinafter "Scottsdale"), through undersigned counsel, to relate the facts and law in support of its Motion for Summary Judgment concerning defendants' liability. Unless otherwise indicated, Scottsdale will refer to exhibits as previously identified in connection with Scottsdale's original Motion for Summary Judgment filed on June 27, 2000.

### A. FACTUAL BACKGROUND

#### 1. Original personal injury lawsuit of Van Lauren McCahill

In September 1992, Van Lauren McCahill filed suit against Scottsdale and an insured, Mayer Investments, Inc.  Mr. McCahill alleged in, *Van Lauren McCahill v. Scottsdale Insurance Company, et al.,* Docket No. 92-15408, Division "I", Civil District Court for Orleans Parish, that on February

1.

29, 1992, he fell from an apartment balcony when a rail broke, fracturing his left leg.

### 2. Charity Hospital's treatment of McCahill led to amputation.

Mr. McCahill was taken to the Medical Center of Louisiana at New Orleans (hereinafter "Charity") for treatment of his fracture. Charity physicians treated Mr. McCahill from the date of his accident, February 29, 1992, and for the next two and one-half years. However, such treatment proved unsuccessful. On April 10, 1994, Mr. McCahill underwent an amputation of his left leg below the knee.

### 3. Defendants do not speak with Mr. McCahill about the medical malpractice case.

On June 24, 1994, Scottsdale changed defense counsel and retained defendants, Scott G. Jones, Esq. and the firm of Hulse and Wanek, to defend against Mr. McCahill's lawsuit. On July 21, 1994, Scottsdale settled Mr. McCahill's personal injury action for $600,000. Exhibit D. At the settlement conference, Mr. Jones raised with Mr. McCahill and his counsel, Michael J. Hingle, the prospect of pursuing a medical malpractice case against Charity to recover Scottsdale's $600,000 settlement. However, neither Mr. McCahill nor Mr. Hingle said anything in response. Exhibit V at p. 22, line 20-p. 24, line 8. Mr. Jones did not actually have any conversation with Mr. McCahill at the conference. Id at p. 66, line 22-p. 68, line 8. Mr. Jones had the impression Mr. McCahill was not interested in discussing a malpractice action since he was receiving a $600,000 settlement that day. Id at p. 67, line 15-p. 68, line 8.

Mr. Jones did not speak again with Mr. McCahill following the July 21, 1994 settlement conference until after he filed Scottsdale's medical

2.

malpractice Petition with the PCF on April 12, 1995. Id at p. 37, line 9-p. 38, line 16. Mr. Jones' lack of communication with Mr. McCahill relates to Mr. Jones' decision not to tell Scottsdale about his late filing of Scottsdale's Petition before the PCF, the wrong entity. Mr. Jones claims the one year prescriptive period did not start on April 10, 1994, the date of his amputation, but instead from the July 21, 1994 settlement conference when Mr. Jones broached to Mr. McCahill the idea of a medical malpractice action. Exhibit J at p. 1, para. 1; Exhibit Q; Exhibit V at p. 66, line 22-p. 67, line 14. Thus, Mr. Jones claims, his belated May 26, 1995 filing of Scottsdale's Petition was timely and he need not inform Scottsdale to the contrary.

Mr. McCahill never **told** Mr. Jones he did **not** know of Charity Hospital's malpractice before the July 21, 1994 settlement conference. Exhibit V at p. 23, line 4-p. 24, line 14. When Mr. Jones finally spoke to Mr. McCahill about the med mal case years later, Mr. McCahill consistently acknowledged his appreciation, prior to his April 10, 1994 amputation, of Charity's medical malpractice. See Exhibits K, L at p. 1, R at p. 1, 2d para.

**4. Defendants file Scottsdale's lawsuit too late and before the wrong administrative body.**

April 10, 1995 was the one year anniversary of Mr. McCahill's amputation. Mr. Jones planned to file Scottsdale's medical malpractice Petition before April 10, 1995 to preclude Charity from arguing Scottsdale's case had prescribed. Exhibit V at p. 48, line 21-p. 49, line 21. On February 6, 1995, Mr. Jones wrote Ms. Deborah Gildener, a medical consultant for Scottsdale, that, "we may only have until April 10, 1995, to complete our evaluation and begin the process of filing a claim against Charity Hospital." Exhibit W, 2d para. However, defendants failed to meet the one year

3.

deadline.  Exhibit G;  Exhibit V at p. 49, line 22-p. 50, line 9.

Defendants also filed Scottsdale's Petition before the Patients
Compensation Fund (hereinafter "PCF"), the wrong body.  Medical
malpractice actions against a state medical facility like Charity must be filed
with the Division of Administration.  La. R.S. 40: 1299.39.1.

**5. Defendants did not tell Scottsdale that they filed its Petition too
late and before the wrong administrative body.**

Defendants did not tell Scottsdale that they misfiled its medical
malpractice Petition.  On November 26, 1996, defendants filed Scottsdale's
medical malpractice Petition in the matter entitled, *Van Lauren McCahill and
Scottsdale Insurance Company v. The Louisiana Health Care Authority
Medical Center of Louisiana at New Orleans a/k/a Charity Hospital*, Docket
No. 96-20010, Civil District Court.  Exhibit I.

On January 24, 1997, Scott Jones wrote Scottsdale that he anticipated
Charity would file an Exception of Prescription.  Exhibit J;  Exhibit V at p.
84, lines 14-25.  Mr. Jones described Charity's prescription exception as
"**ridiculous**" and without merit.  Id p. 85, lines 14-24.  Mr. Jones did not
disclose to Scottsdale the real basis for Charity's prescription exception.

**6. McCahill consistently tells Mr. Jones of his pre-amputation
knowledge of Charity's medical malpractice.**

On July 21, 1997, Mr. Jones wrote Scottsdale that Mr. McCahill
recalled that a "pre-amputation" treating physician, Dr. Ken Adato, "frankly
told him", that Charity did not properly fixate his ankle during the original
surgery.  Exhibit K at para. 2.  On December 5, 1997, Mr. Jones again wrote
that Drs. Adatto and John Burvant told Mr. McCahill before his amputation
that Charity did not provide him proper medical treatment.  Exhibit L at p. 1,

4.

para. 2, p. 2, para. 1;  Exhibit V at p. 91, line 1-p. 92, line 12.

On July 15, 1999, Charity filed an Exception of Prescription in Scottsdale's Civil District Court medical malpractice action.  Exhibit P. On September 8, 1999, Mr. Jones falsely reported to Ms. Brezinski that, "[T]o my surprise", Mr. McCahill had just "admitted" he had known about Charity's medical malpractice from an early stage in his treatment.  Exhibit R; Exhibit V at p. 119, line 6-p. 122, line 10.

On September 8, 1999, the same day that Mr. Jones wrote to Scottsdale expressing his "surprise" about Mr. McCahill's knowledge of Charity's pre-amputation medical malpractice, Mr. Jones also wrote to Mr. McCahill.  Exhibit 1 attached hereto.  Contrary to what Mr. Jones wrote Scottsdale, Mr. Jones' letter to Mr. McCahill recounted that, "you have related to me on several occasions that you were made aware, very shortly after your first surgery, that the surgery was done in an improper fashion..."

### 7. Defendants draft a false affidavit for Mr. McCahill.

On September 22, 1999, defendants filed a Memorandum in Opposition to the State's Exception of Prescription.  Exhibit S.  Defendants told the trial court that Mr. McCahill did not know of Charity's medical malpractice until informed by Scott Jones on July 21, 1994.   Defendants' Memorandum contradicted their own correspondence of July 21, 1997, December 5, 1997 and two letters of September 8, 1999, all of which verified Mr. McCahill's knowledge of medical malpractice before his amputation.

Mr. Jones drafted and notarized an affidavit for Mr. McCahill to sign, Exhibit T, wherein Mr. McCahill claimed he did not know Charity Hospital's medical malpractice until the July 21, 1994 settlement conference.  Exhibit V at p. 137, lines 7-23.  Mr. McCahill confirms the affidavit Mr. Jones brought

5.

to his home to have him sign is false. Exhibit X at p. 12, line 4-p. 17, line 5. Defendants acknowledge that Mr. McCahill deems Mr. Jones' affidavit "inaccurate". Memorandum in Support of (Defendants') Motion for Summary Judgment at p. 7 n. 3.

**8. Scottsdale appoints present counsel and withdraws opposition to Charity's Prescription Exception.**

On October 15, 1999, Scottsdale retained undersigned counsel to pursue its medical malpractice claim against Charity. Upon review of the file, undersigned counsel determined defendants had not only caused Scottsdale's medical malpractice case to prescribe, but also failed to disclose and even concealed the facts surrounding the prescription of Scottsdale's claim.

Prior to a hearing set for Charity's Exception of Prescription, undersigned counsel placed defendants on notice that Scottsdale held them responsible for allowing its medical malpractice claim to prescribe. Exhibit BB. However, defendants insisted that Scottsdale participate in their fraud upon the trial court and use the McCahill affidavit to defeat the State of Louisiana's prescription exception. Exhibit CC. Defendants also implicitly demanded that Scottsdale not reveal the falsity of the McCahill affidavit to the trial court. Had Scottsdale managed to defeat Charity's prescription exception, Scottsdale and counsel would, of course, would have then been required to continue to suborn Mr. Cahill in any deposition and trial testimony regarding his knowledge of Charity's medical malpractice prior to his amputation.

On January 4, 2000, Scottsdale withdrew its opposition to the State's exception. Scottsdale considered any opposition based upon Mr. McCahill's affidavit or the defendants' opposition memorandum to be both legally

6.

inadvisable and professionally unethical. On January 21, 2000, the Civil District Court for Orleans Parish in *Van Lauren McCahill, et al v. The Louisiana Health Care Authority, et al*, Docket No. 96-20010, sustained Charity's Exception of Prescription.

## B. ARGUMENT

### 1. Violation of Rules of Professional Conduct is violation of law.

The Rules of Professional Conduct have the force and effect of law. *Saucier v. Hayes Dairy Products, Inc.*, 373 So.2d 102, 115 (La. 1979). When an attorney violates the Rules of Professional Conduct and such a breach is a cause in fact of his client's damages, the client may recover in tort. *Ratcliff v. Boydell,* supra, 674 So.2d at 279-80; *Schlesinger v. Herzog,* 672 So.2d 701 (La. App. 4th Cir. 1996).

### 2. Filing of false affidavit violates Rules 4.1 and 8.4(c).

Defendants' decision to draft, notarize and file with the medical malpractice trial court Mr. McCahill's false affidavit violates Rules 4.1 and 8.4(c) of the Rules of Professional Conduct. *In re Stephens,* 645 So.2d 1133 (La. 1994). The Louisiana Supreme Court in *Louisiana State Bar Association v. Boutall,* 597 So.2d 444, 445 (La. 1992), held:

> Executing a false affidavit is a serious breach of ethics, which directly affects the practice of law and calls into question his ability to discharge his professional duties.

In accord, *In re Sealed Appellant,* 194 F.3d 666 (5th Cir. 1999); *In re Quaid,* 646 So.2d 343, 349 (La. 1994).

To whatever extent Scottsdale may have been able to honestly overcome the State of Louisiana's prescription exception, all opportunities

7.

were lost when defendants chose to mislead the trial court with Mr. McCahill's affidavit. Even had Scottsdale and undersigned counsel been willing to participate in defrauding the trial court as defendants urged, the fraud would not have stopped with the defeat of Charity's prescription exception. Among other things, Scottsdale would have had to suborn Mr. McCahill in his future deposition and trial testimony to suppress any truthful reference to his pre-amputation knowledge of Charity's medical malpractice. Scottsdale and undersigned counsel declined to travel down that road.

## CONCLUSION

Scottsdale moves the Court to find as an uncontested matter of fact and law that defendants' decision to draft, notarize and file the purported affidavit of Mr. McCahill, Exhibit T, violates Rules 4.1 and 8.4(c) of the Rules of Professional Conduct. Scottsdale moves that Court to find in turn that the filing of Mr. McCahill's affidavit is legal malpractice as a matter of law.

Scottsdale prays for any additional relief which this Court may deem just.

Respectfully submitted,

Mark L. Ross, Bar No. 11477
Attorney for Scottsdale
Insurance Company
600 Jefferson Street, Suite 501
Lafayette, Louisiana  70501
Telephone  (337) 266-2345
Facsimile: (337) 266-2163

**8.**

## UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF LOUISIANA

SCOTTSDALE INSURANCE                    CIVIL ACTION NO. 00225
COMPANY

vs.                                     SECTION "F"

SCOTT G. JONES, ESQ.,                   MAGISTRATE DIVISION (4)
HULSE AND WANEK, PLC
AND XYZ INSURANCE
COMPANY

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### SHORT AND CONCISE STATEMENT OF MATERIAL FACTS
### AS TO WHICH SCOTTSDALE INSURANCE COMPANY
### CONTENDS THERE IS NO GENUINE ISSUE TO BE TRIED
### PURSUANT TO LOCAL RULE 56.1

**NOW COMES** Scottsdale Insurance Company (hereinafter
"Scottsdale"), through undersigned counsel, and pursuant to Local Civil Rule
56.1, outlines those issues of material fact as to which Scottsdale contends
there exists no genuine issue to be tried.  To avoid overburdening the Court
with documents, Plaintiff will refer to Exhibits as they were identified and
attached to plaintiff's original Motion for Summary Judgment filed on June
27, 2000, unless otherwise stated.

### 1.

In September 1992, Van Lauren McCahill filed suit against Scottsdale
and its insured, Mayer Investments, Inc.  Mr. McCahill alleged in the case
entitled, *Van Lauren McCahill v. Scottsdale Insurance Company, et al.,*
Docket No. 92-15408, Division "I", Civil District Court for Orleans Parish,

that on February 29, 1992, he fractured his left leg when he fell from an apartment balcony rented by Mayer Investments.

## 2.

Mr. McCahill was taken to the Medical Center of Louisiana at New Orleans (hereinafter "Charity") for treatment of his left leg fracture. Mr. McCahill received treatment from Charity physicians from the date of his accident, February 29, 1992, and for the next two and one-half years. However, such treatment proved unsuccessful. On April 10, 1994, Mr. McCahill underwent an amputation of his left leg below the knee.

## 3.

On June 24, 1994, Scottsdale retained defendants, Scott G. Jones, Esq. and the firm of Hulse and Wanek, to defend Scottsdale and its insured against Mr. McCahill's  personal injury case.

## 4.

On July 21, 1994, Mr. Jones settled Mr. McCahill's personal injury action against Scottsdale for $600,000.  Exhibit D.  Mr. Jones also broached the subject of pursuing a medical malpractice case against Charity with Mr. McCahill and his attorney to recover the settlement funds Scottsdale paid him.  However, Mr. McCahill made no response whatsoever.  Exhibit V at p. 67, line 15-p. 68, line 14.

## 5.

After the July 21, 1994 settlement conference, Mr. Jones did not speak with Mr. McCahill again until some time after he drafted and filed Scottsdale's medical malpractice Petition for Damages against Charity with the Patient's Compensation Fund on April 12, 1995. Exhibit V at p. 37, line 9-p. 38, line 16.

**6.**

April 10, 1995 was the one year anniversary of Mr. McCahill's left leg amputation. Mr. Jones planned to file Scottsdale's medical malpractice Petition before April 10, 1995 to preclude the State of Louisiana from arguing the Petition had to be filed within one year of Mr. McCahill's amputation. Exhibit V at p. 48, line 21-p. 49, line 21; Letter from Scott Jones to Ms. Deborah G. Gildener dated February 6, 1995, 2d para. (Exhibit W).

**7.**

Defendants, Scott Jones and Hulse and Wanek, failed to file Scottsdale's medical malpractice Petition by April 10, 1995. Instead, defendants filed Scottsdale's Petition with the Patients Compensation Fund two days later on April 12, 1995. Exhibit G; Exhibit V at p. 49, line 22-p. 50, line 9.

**8.**

Defendants filed Scottsdale's medical malpractice Petition before the Patients Compensation Fund (hereinafter "PCF"), the wrong entity. Mr. Jones had incorrectly believed all medical malpractice Petitions were filed with the PCF. See Exhibit W at p. 1, para 2.

**9.**

On May 26, 1995, 46 days after the one year anniversary of Mr. McCahill's amputation, defendants refiled Scottsdale's medical malpractice Petition against Charity before the Division of Administration. Exhibit H. Defendants did not disclose their failed attempt to timely file Scottsdale's Petition on April 10, 1995 to Scottsdale.

**10.**

On November 26, 1996, defendants filed a medical malpractice
Petition on behalf of Scottsdale in Civil District Court for Orleans Parish in
the matter entitled, *Van Lauren McCahill and Scottsdale Insurance Company
v. The Louisiana Health Care Authority Medical Center of Louisiana at New
Orleans a/k/a Charity Hospital*, Docket No. 96-20010.  Exhibit I.

**11.**

On July 21, 1997, Mr. Jones wrote Scottsdale that Mr. McCahill
recalled that a treating physician, Dr. Ken Adato, "frankly told him", that
Charity Hospital did not properly fixate his ankle during the original surgery
prior to the amputation of his left leg.  Exhibit K at para. 2.

**12.**

On December 5, 1997, Mr. Jones wrote Scottsdale that Mr. McCahill
recalled Dr. Adatto and the original treating surgeon, Dr. John Burvant, told
Mr. McCahill that Charity did not provide him proper medical treatment prior
to his amputation.  Exhibit L at p. 1, para 2, p. 2, para.1;  Exhibit V at p. 91,
line 1-p. 92, line 12.

**13.**

On July 15, 1999, Charity filed an Exception of Prescription in
Scottsdale's Civil District Court medical malpractice action.  Exhibit P.

**14.**

On September 8, 1999, Mr. Jones wrote Scottsdale's Ms. Brezinski
that "[T[o my surprise", Mr. McCahill "admitted" he was aware very early on
that he had not received adequate medical care at Charity.  Exhibit R at p. 1
para. 2.

**15.**

Mr. Jones September 8, 1999 letter, Exhibit R, repeats Mr. McCahill's "pre-amputation" knowledge of medical malpractice discussed two years earlier in Mr. Jones' correspondence of July 21 and December 5, 1997. Exhibits K and L.

**16.**

On September 8, 1999, the same day that Mr. Jones wrote to Scottsdale expressing his surprise regarding Mr. McCahill's knowledge of Charity's pre-amputation medical malpractice, Mr. Jones also wrote to Mr. McCahill. Exhibit 1 attached hereto. Completely contrary to what Mr. Jones wrote Scottsdale, Mr. Jones' letter to Mr. McCahill recounted that, "you have related to me on several occasions that you were made aware, very shortly after your first surgery, that the surgery was done in an improper fashion..."

**17.**

On September 22, 1999, defendants filed a Memorandum in Opposition to the State's Exception of Prescription. Exhibit S. Although Mr. Jones had written to Scottsdale on July 21, 1997, December 5, 1997 and September 8, 1999, and to Mr. McCahill of September 8, 1999, discussing Mr. McCahill's knowledge of medical malpractice before his amputation, defendants told the trial court the opposite. Defendants told the trial court that Mr. McCahill knew nothing of Charity's medical malpractice until informed by Mr. Jones on July 21, 1994. Exhibit S at p. 2, para. 4.

**18.**

Mr. McCahill did not know any prescription issue existed until September 1999. Sworn Statement of Van Lauren McCahill taken on January 21, 2000 at p. 12, lines 4-25. Exhibit X.

**19.**

Mr. McCahill recalled that Mr. Jones came to his home and asked him to sign an Affidavit, Exhibit T.  Id at p. 14, line 8-p. 15, line 4.

**20.**

When read to him, Mr. McCahill testified the Affidavit Mr. Jones had him sign was false.  Id at p. 15, line 5-p. 17, line 5.  Deposition of Van Lauren McCahill taken on December 15, 2000 at p. 17, line 3-p. 22, line 13; p. 27, line 8-p. 28, line 9.  Exhibit 2.

**21.**

No evidence, verbal or in writing, supports defendants' claimed belief that Mr. McCahill did not know of Charity's medical malpractice before his April 10, 1994 amputation.

**22.**

The affidavit which Mr. Jones drafted, induced Mr. McCahill to sign and which he notarized, Exhibit T, is false to the extent it claims Mr. McCahill did not know of Charity's medical malpractice prior to his April 10, 1994 amputation.

**23.**

On January 4, 2000, Scottsdale withdrew its opposition to Charity's prescription exception, informing defendants that Scottsdale would not oppose the State of Louisiana's prescription exception with the use of Mr. McCahill's affidavit.  Exhibits BB at p. 3, 3d para.  On January 21, 2000, the Civil District Court in *Van Lauren McCahill, et al v. The Louisiana Health Care Authority, et al*, Docket No. 96-20010, sustained the State's Exception of Prescription.

Respectfully submitted,

Mark L. Ross, Bar No. 11477
Attorney for Scottsdale
Insurance Company
600 Jefferson Street, Suite 501
Lafayette, Louisiana  70501
Telephone  (337) 266-2345
Facsimile: (337) 266-2163

810 BARONNE STREET
NEW ORLEANS, LOUISIANA 70113-1004
(504) 524-6221
FAX (504) 529-4106

404 E. GIBSON STREET
SUITE A
COVINGTON, LOUISIANA 70433-2926
(504) 893-5953
FAX (504) 893-2932

CHRISTENSEN
E. THADDEUS WESTHOLZ
KEVIN J. CHRISTENSEN
MONIQUE M. GARSAUD

OF COUNSEL
JOHN R. SCHUPP
CALLENDER F. HADDEN, JR.

WEB  www.hulsewanek.com
e-mail  dls@hulsewanek.com

PLEASE RESPOND TO
NEW ORLEANS OFFICE

September 8, 1999

Mr. Van L. McCahill
P. O. Box 1979
Albany, LA  70711

    RE:  Van McCahill, et al v.
        The La. Health Care Authority
        Our File: 274-5439

Dear Van:

    Enclosed is your copy of the Exception of Prescription filed by Charity Hospital. Upon further review of the Exception, and based on our recent discussions, I find myself now somewhat concerned about this Exception. Specifically, you have related to me on several occasions that you were made aware, very shortly after your first surgery, that the surgery was done in an improper fashion because the proper amount of plates and screws were not used. Accordingly, that makes for a very good argument that you were aware of malpractice sometime back in 1992 following the first surgery in February. If that was the case, then a malpractice action should have been initiated back in February or March of 1993. Obviously, I was not able to even commence this action until May of 1995 because I did not have an attorney client relationship with you until shortly before that time.

    The bottom line from this is that I am deeply concerned, now, that the State may have a good argument on this Exception. Accordingly, in that regard, I have recommended to Scottsdale Insurance Company that I be given authority to negotiate a settlement for as much as I can obtain. I have also indicated to Scottsdale Insurance Company your desire to settle the case, with the hopes that we could possibly recover most or all of the medical bills that you paid out of your prior recovery.



# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| SCOTTSDALE INSURANCE | * | CIVIL ACTION: |
| COMPANY | * | # 00-225 |
| | * | |
| VERSUS | * | MAGISTRATE: 4 |
| | * | |
| SCOTT G. JONES, ESQ. | * | |
| HULSE & WANEK, P.L.C. | * | |
| AND XYZ INSURANCE CO. | * | |

Deposition of **VAN LAUREN McCAHILL**, taken at the offices of Affirmative Court Reporting Services, 606 E. Morris Avenue, Suite D, Hammond, Louisiana, on Friday, December 15, 2000, commencing at or about 3:37 p.m.

Reported by:

    Jamie L. Terrio, CVR, CCR
    Certified Court Reporter



17

1    medical malpractice case?

2         A.   No.   We didn't.

3         Q.   Let me show you a document which I'm

4    going to mark as Exhibit 2.   (Tendering

5    document)

6         A.   Okay.

7         Q.   This is entitled, Affidavit of Van

8    Lauren McCahill.   And at the bottom, you can

9    see the date of September 22, 1999.   Do you

10   remember signing this affidavit?

11        A.   That's my handwriting.   Like I say, I'm

12   not good with dates.

13        Q.   Okay.   Well, do you  remember you were

14   indicating that you had a meeting with Mr.

15   Jones where you signed an affidavit?

16        A.   That was -- that must have been the

17   day, then.

18        Q.   Do you recognize this paper?

19        A.   I can't see.   I don't have my glasses

20   on.   I can't see this paper good.

21        Q.   But the date, September 22, 1999, does

22   that sound about --

23        A.   That sounds about right.

24        Q.   -- right?

25        A.   About right.

Q. Let's go through a couple of them. If you're having trouble reading them, I'll read them out to you.

Well, I guess -- you can't read it?

A. Not really.

Q. All right. Let me read the whole thing, then. After the preliminary, the body of it, it says: (reading from document)

I was injured as a result of an accident that occurred on February 29th, 1992 when I fell from a balcony located at 1539 Euterpe Street in New Orleans, Louisiana. This fall, which occurred as a result of a broken handrail on the balcony, caused me to fracture my ankle.

Subsequently, I received treatment at Charity Hospital in New Orleans. During the entire course of my treatment at Charity and even through the time my leg was amputated, I was under the belief that I was receiving adequate and competent medical treatment by the various physicians who treated me through Charity Hospital.

Eventually on July 21, 1994, I entered into a settlement agreement with the

19

1  defendants, who I had sued as a result of the

2  fall from the balcony.  At that time, I became

3  aware for the first time upon discussing this

4  matter with my current attorney, that there may

5  have been some negligence on the part of

6  various physicians at Charity Hospital in

7  causing my leg to be amputated.

8          Accordingly, I had no knowledge or any

9  reason to suspect negligence on the part of the

10  physicians at Charity until such information

11  was passed on to me at the time of the

12  settlement conference of July 21, 1994 when I

13  executed the Receipt and Release of my original

14  lawsuit.

15          And then it goes on to say that this

16  statement was true and correct to the best of

17  my knowledge and was signed in Baptist,

18  Louisiana on the 22nd day of September 1999.

19      A.  That's the affidavit that he had me

20  sign?

21      Q.  Well, I guess so.

22      A.  I told you that I've got the flu.  My

23  head -- I'm groggy and I'm trying.

24          MR. ROSS:

25          Are you on any medication?

20

1          THE WITNESS:

2              Yes.

3     BY MR. WRIGHT:

4          Q.   What medication are you on?

5          A.   I don't even know the name of it.   It's

6     some blue thing.   It's supposed to clear your

7     congestion up and your cold.

8          Q.   Well, we had asked before and I had

9     said does September 22, 1999 sound about the

10    time that he came and visited you and had you

11    sign an affidavit and you said yes.   So I'm

12    assuming and I think it's safe for you to

13    assume that this is the affidavit that was

14    signed on that occasion.

15             Let's go over a couple of things in

16    this affidavit.

17         A.   Okay.

18         Q.   One sentence that I read to you before

19    says that: (reading from document)

20             Subsequently, I received treatment at

21    Charity Hospital.   During the entire course of

22    my treatment at Charity and even through the

23    time my leg was amputated, I was under the

24    belief that I was receiving adequate and

25    competent medical treatment by the various

1    medical physicians who treated me through

2    Charity Hospital.

3            Is that true?

4        A.  Well, do you  remember a few minutes

5    ago when I told you that Dr. Burvant and Dr.

6    Adatto -- now when I'm talking about Dr.

7    Burvant, he was the one that did the original

8    surgery on my leg.  And I'm talking about just

9    a couple of years later because I went to

10   Charity off and on for two or three years that

11   he told me that they messed up.

12           And do, evidently as I told you a few

13   minutes ago, that's the way it was.  Now what's

14   on there -- like I say, Scott was my attorney

15   and all he wanted me to do was to sign it.

16   That's all he got there and he wanted me to

17   sign it.

18           And I read it, but I don't have -- I

19   don't have -- I did read it.  But as far as me

20   telling you what was on there, especially right

21   now, I mean, I can't say word-for-word what's

22   on that paper.

23       Q.  Well then, my question is: Is this

24   statement true?  This statement in your

25   affidavit.  And I'll read it to you again if

22

1   you want.  Do you want me to read it again?

2       A.  Yes.  I want to make sure I understood

3   it.

4       Q.  (Reading from document) Subsequently, I

5   received treatment at Charity Hospital in New

6   Orleans.  During the entire course of my

7   treatment at Charity and even through the time

8   that my leg was amputated, I was under the

9   belief that I was receiving adequate and

10  competent medical treatment by the various

11  physicians who treated me through Charity

12  Hospital.

13      A.  That's not true.

14      Q.  All right.  And it's not true because

15  of what you just testified that you had talked

16  to some doctors?

17      A.  Like I said, he was my attorney.  I

18  trusted him.  He was my attorney.  And I might

19  have just glanced over it and everything.  But

20  the truth is -- the truth is that I felt like

21  something was wrong when Dr. Burvant first

22  brought this up to me and then Dr. Adatto.

23  That's not true.  I mean, you're talking about

24  a year or two after the surgery.  Dr. Burvant

25  brought this up.

27

1    Q.   But at the time, did you understand at

2  the time that he said that, that you might have

3  to have your leg amputated?

4    A.   No.  I didn't.

5    Q.   All right.  Let's --

6    A.   I still had hopes that something was

7  going to be done.

8    Q.   Continuing on in this affidavit, I want

9  to read another part that I've already read and

10  ask you a question about it.  It says (reading

11  from document):

12         Eventually on July 21st, 1994, I

13  entered into a settlement agreement with the

14  defendants who I had sued as a result of the

15  fall from the balcony.  At that time, I became

16  aware for the first time upon discussing this

17  matter with my current attorney, that there may

18  have been some negligence on the part of

19  various physicians at Charity Hospital in

20  causing my leg to be amputated.

21         Is that a true sentence?

22    A.   Read it again, because I was coughing.

23    Q.   Okay.  I'm going to read you the second

24  sentence of that paragraph (reading from

25  document):

1          At that time -- that is the time of the

2     settlement, July 21, 1994 -- I became aware for

3     the first time upon discussing this matter with

4     my current attorney, that there may have been

5     some negligence on the part of various

6     physicians at Charity Hospital in causing my

7     leg to be amputated.

8          Is that true?

9     A.   That's not true.

10    Q.   Why isn't that true?

11    A.   I guess because of what I've been

12    telling you.  If I probably became aware of

13    that when he give me the check for the first

14    time, then all of this other stuff that I'm

15    telling you wouldn't be true, would it?

16    Q.   And as far as, did you ever refer to

17    what Dr. Burvant and what Dr. Adatto told you

18    as being their belief that there was

19    negligence?

20    A.   Well, from their statements, I listen

21    to doctors like I listen to lawyers.  I'm not

22    either one.  I'm not a doctor and I'm not a

23    lawyer.  But I listen to doctors.  And they got

24    me to thinking about it.

25    Q.   And when you started thinking about it,

# UNITED STATES DISTRICT COURT FOR
# THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **SCOTTSDALE INSURANCE COMPANY** | **CIVIL ACTION NO. 00225** |
| **vs.** | **SECTION "F"** |
| **SCOTT G. JONES, ESQ., HULSE AND WANEK, PLC AND XYZ INSURANCE COMPANY** | **MAGISTRATE DIVISION (4)** |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## NOTICE OF HEARING

TO:  William Wright, Jr., Esq.
     Margaret L. Sunkel, Esq.
     Deutsch, Kerrigan & Stiles
     755 Magazine Street
     New Orleans, La.  70130-3672

PLEASE TAKE NOTICE that Scottsdale Insurance Company will bring the attached Motion for Summary Judgment on for hearing before the Honorable Martin L.C. Feldman of the United States District Court for the Eastern District of Louisiana on the 24th day of January, 2001, at 10:00 a.m., 500 Camp Street, New Orleans, Louisiana 70130.

Respectfully submitted,

_Mark L. Ross_
Mark L. Ross, Bar No. 11477

Attorney for Scottsdale
Insurance Company
600 Jefferson Street, Suite 501
Lafayette, Louisiana  70501
Telephone  (337) 266-2345
Facsimile: (337) 266-2163

## LR 5.3 CERTIFICATE OF SERVICE

I certify that on this _8th_ day of _January_, 2001, a copy of the foregoing pleading has either been hand delivered or mailed to all counsel of record by depositing same in the United States mail, postage prepaid and properly addressed.

MARK L. ROSS