FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2001 JAN 12  AM 11: 16

LORETTA G. WHYTE
CLERK

## UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| SCOTTSDALE INSURANCE COMPANY | CIVIL ACTION NO. 00225 |
| vs. | SECTION "F" |
| SCOTT G. JONES, ESQ., HULSE AND WANEK, PLC AND XYZ INSURANCE COMPANY | MAGISTRATE DIVISION (4) |

C.A. 00-225

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## SCOTTSDALE INSURANCE COMPANY'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY

**NOW COMES** Scottsdale Insurance Company (hereinafter "Scottsdale"), through undersigned counsel, to respond to defendants' 11th hour prescription Motion for Summary Judgment. Defendants motion should be denied since defendants concealed from their clients, Scottsdale and Van Lauren McCahill, first, the existence of a prescription issue and, secondly, the merits of the issue. Defendants fraudulent concealment of their legal malpractice from their clients renders prescription inapplicable under La. R.S. 9:5605(E), a provision which defendants do not even discuss in their Motion. Defendants' failure to discuss this dispositive issue warrants denial of defendants' Motion for Summary Judgment.

## A. FACTUAL BACKGROUND

In September 1992, Van Lauren McCahill filed suit against Scottsdale and an insured, Mayer Investments, Inc. Mr. McCahill alleged he fell from an apartment balcony, fracturing his left leg.

1.

Mr. McCahill was taken to the Medical Center of Louisiana at New Orleans (hereinafter "Charity") for treatment of his fracture. Charity physicians treated Mr. McCahill for the next two and one-half years. However, such treatment proved unsuccessful. On April 10, 1994, Mr. McCahill underwent an amputation of his left leg below the knee.

### 1. Scottsdale retained defendants as counsel.

On June 24, 1994, Scottsdale retained defendants, Scott G. Jones, Esq. and the firm of Hulse and Wanek, to defend against Mr. McCahill's lawsuit. On July 21, 1994, Scottsdale settled Mr. McCahill's personal injury action for $600,000. Exhibit D. At the settlement conference, Mr. Jones mentioned to Mr. McCahill and his counsel, Michael J. Hingle, the prospect of pursuing a medical malpractice case against Charity to recover Scottsdale's $600,000 settlement. However, neither Mr. McCahill nor Mr. Hingle said anything in response. Exhibit V at p. 22, line 20-p. 24, line 8. Mr. Jones had the impression Mr. McCahill was not interested in discussing a malpractice action since he was receiving a $600,000 settlement that day. Id at p. 67, line 15-p. 68, line 8.

Mr. Jones did not speak again with Mr. McCahill following the July 21, 1994 settlement conference until after he filed Scottsdale's medical malpractice Petition with the PCF on April 12, 1995. Id at p. 37, line 9-p. 38, line 16. Mr. Jones claims that his failure to communicate with Mr. McCahill, a major witness in the medical malpractice case, justifies his argument that the one year prescriptive period did not start from the April 10, 1994 amputation, but instead from the July 21, 1994 settlement conference. Exhibit J at p. 1, para. 1; Exhibit Q; Exhibit V at p. 66, line 22-p. 67, line 14. Mr. Jones' story that Mr. McCahill did not know of medical malpractice until

2.

the July 21, 1994 settlement conference is contradicted by every statement Mr. McCahill did make to Mr. Jones when asked. As an uncontested matter of fact, Mr. McCahill never **told** Mr. Jones he did **not** know of Charity Hospital's malpractice before the July 21, 1994 settlement conference.

**2. Defendants file Scottsdale's lawsuit too late and before the wrong administrative body.**

Defendants create a material issue of fact and law by refusing to even discuss their failure to file Scottsdale's medical malpractice Petition by April 10, 1995, the one year anniversary of Mr. McCahill's amputation. See Memorandum in Support of Motion for Summary Judgment (hereinafter "Defendants' Memorandum) at p. 4, first sentence.

Mr. Jones planned to file Scottsdale's medical malpractice Petition before April 10, 1995 to preclude Charity from arguing Scottsdale's case had prescribed. Exhibit V at p. 48, line 21-p. 49, line 21. Mr. Jones wrote Ms. Deborah Gildener, a Scottsdale medical consultant, that, "we may only have until April 10, 1995, to complete our evaluation and begin the process of filing a claim against Charity Hospital." Exhibit W, 2d para. Mr. Jones did not write Ms. Gildener about an alleged theory that defendants could wait and file Scottsdale's Petition until July 21, 1995.

Defendants also filed Scottsdale's Petition before the Patients Compensation Fund (hereinafter "PCF"), the wrong body. Mr. Jones incorrectly wrote Scottsdale on April 11, 1995, the day the case prescribed, that the PCF was, "administrative board that handles **all** malpractice claims in Louisiana prior to the filing of a tort suit." Exhibit Y, p. 1, 2d para. (emphasis added). On May 26, 1995, 46 days after the one year anniversary of Mr. McCahill's amputation, defendants refiled Scottsdale's Petition with the

3.

Division of Administration.  Exhibit H.

**3. Defendants did not tell Scottsdale that they filed its Petition too late and before the wrong administrative body.**

Defendants **never** told Scottsdale that they misfiled its medical malpractice Petition two days too late and before the wrong entity.  To excuse their fraudulent concealment from Scottsdale, defendants propose a novel legal standard.  Defendants argue that before they had to tell Scottsdale of the foregoing events, **defendants** must first "reasonably believe" that their acts were "fatal" to Scottsdale's medical malpractice action.  Defendants' Memorandum at p. 4, n 1.  As discussed below, Louisiana law and the U.S. Fifth Circuit repudiate defendants' rationale for the concealment of seriously prejudicial information from their own clients.

**4. Scottsdale examiners did not know true facts behind prescription exception.**

Defendants concede that they did not reveal to Scottsdale from April 12, 1995 until July 19, 1996 that any prescription issue existed due to defendants' faulty filing of Scottsdale's Petition.  Defendants contend that they finally revealed the existence of the prescription issue by sending Mr. Rick Kannally a copy of Scottsdale's opposition to the State of Louisiana's 4.prescription exception.  Defendants' Memorandum at p. 4;  Exhibit B to Defendants' Motion for Summary Judgment.  However, Mr. Jones' brief misled rather than educated Scottsdale about the prescription issue.  Defendants' memorandum argues, "Mr. McCahill promptly filed his claim herein on May 26, 1995".  Exhibit B to Defendants' Motion at p. 2, bottom para.  Defendants' memorandum thereby concealed from Scottsdale what the

4.

State of Louisiana's prescription exception actually showed.

Defendants have filed a concurrent Motion to Strike the Affidavit of Mr. Kannally. Scottsdale has asked that, among other things, defendants file an affidavit from Mr. Jones explaining what he claims is incorrect with Mr. Kannally's affidavit. However, although Mr. Jones filed an affidavit with defendants' Motion for Summary Judgment, Mr. Jones' affidavit fails to address any aspect of Mr. Kannally's motion or, for that matter, address the merits of this case at all.

The record shows that defendants' efforts to keep their own client in the dark about their faulty filing of Scottsdale's medical malpractice Petition succeeded over the years. For example, Ms. Beth Brezinski, a Scottsdale examiner who followed Mr. Kannally, testified that when she first reviewed this file in July 1998, she had no idea defendants misfiled Scottsdale's Petition:

> When I reviewed the file, I didn't see anything in there with respect to, you know, the whole filing with the wrong party, the physicians, whatever that is, the physicians review board or whatever.
>
> There's nothing in the file saying when it was filed, and its was filed late. **There's really no notes in the file or anything that I could see that anyone was told about it.** And I sure didn't know about it until Mark (Ross) brought it up to my attention.

Deposition of Ms. Beth Brezinski taken on May 11, 2000 at p. 48, lines 5-23 (hereinafter Exhibit Z) (emphasis added).

**5.**

**5. Mr. Van Lauren McCahill did not know of prescription exception until 1999.**

Mr. Van Lauren McCahill was also defendants' client. See Exhibit O. Nevertheless, defendants failed to tell Mr. McCahill about the existence of a prescription issue until September 1999. Sworn Statement of Van Lauren McCahill taken on January 21, 2000 at p. 12, lines 4-25. Exhibit X. Mr. McCahill repeated when deposed by defendants on December 15, 2000 that he did not know of any prescription issue in the case until told by Mr. Jones in September 1999. December 15, 2000 deposition of Mr. McCahill at p. 39, line 9-44, line 18. Exhibit 1 attached hereto.

**6. Scottsdale filed civil med mal case without knowing merits of Charity's prescription exception.**

On November 26, 1996, defendants filed Scottsdale's medical malpractice Petition in the matter entitled, *Van Lauren McCahill and Scottsdale Insurance Company v. The Louisiana Health Care Authority Medical Center of Louisiana at New Orleans a/k/a Charity Hospital*, Docket No. 96-20010, Civil District Court. Exhibit I. On January 24, 1997, Scott Jones wrote Scottsdale that he anticipated Charity would file an Exception of Prescription. Exhibit J; Exhibit V at p. 84, lines 14-25. Mr. Jones described Charity's prescription exception as "**ridiculous**" and without merit. Id p. 85, lines 14-24. Mr. Jones did not disclose to Scottsdale the real basis for Charity's anticipated prescription exception.

**7. Defendants attempt to settle Scottsdale's case without authority.**

On February 17, 1999, 28 months after filing Scottsdale's case in Civil District Court, Mr. Jones wrote Scottsdale that given Mr. McCahill's supposed "questionable character", Scottsdale should settle its $600,000

medical malpractice claim for $38,000.  Exhibit M.  On the same day Mr.
Jones recommended Scottsdale settle for $38,000, Mr. Jones wrote Charity's
counsel that Mr. McCahill authorized him to settle for $38,000, a settlement
that defendant would, "confirm with Mr. McCahill and Scottsdale."  Exhibit
O; Exhibit V at p. 111, line 21-p. 112, line 18.

Scottsdale did not authorize Mr. Jones to propose a $38,000 settlement
to Charity.  Id at p. 115, line 16-22.  On the contrary, on March 3, 1999,
Scottsdale's Ms. Brezinski rejected Mr. Jones' February 17, 1999 $38,000
recommendation.  Exhibit N.  On May 11, 1999, Mr. Jones wrote Charity's
counsel regarding his "settlement offer" of February 17, 1999.  Exhibit No. 12
to Exhibit V, at page 1, para. 1.  Mr. Jones complained that we, "never
received a response to the offer" and that Mr. Jones had therefore, "been
instructed to withdraw that settlement offer".  Id.  In truth, since Scottsdale
did not know about or authorize the settlement offer, Scottsdale never
instructed Mr. Jones to withdraw it.   Ms. Beth Brezinski confirms
Scottsdale's file did not include Mr. Jones' February 17, 1999 settlement
proposal to Charity's counsel, nor did she know of this settlement proposal
until this litigation.  Exhibit Z1.

**8. Defendants' last effort to conceal prescription .**

On July 15, 1999, Charity filed an Exception of Prescription in
Scottsdale's Civil District Court medical malpractice action.  Exhibit P.

On September 8, 1999, Mr. Jones falsely reported to Ms. Brezinski
that, "[T]o my surprise", Mr. McCahill had just "admitted" he had known
about Charity's medical malpractice from an early stage in his treatment.
Exhibit R; Exhibit V at p. 119, line 6-p. 122, line 10.  Mr. Jones now
professed his deep concern that Charity could win on prescription.  Id at p. 2,

7.

para. 4. Mr. Jones therefore recommended Scottsdale settle its $600,000 claim against Charity for $15,000 before the Court heard Charity's prescription exception. Id.

Mr. Jones September 8, 1999 letter did not actually tell Scottsdale any new information. Mr. Jones' September 8, 1999 letter instead repeated Mr. McCahill's comments recorded two years earlier in Mr. Jones' letters of July 21 and December 5, 1997 regarding Mr. McCahill's "pre-amputation" knowledge of Charity's medical malpractice. Exhibits K and L. On the same day that Mr. Jones wrote Scottsdale about his "surprise" that Mr. McCahill knew about Charity's medical malpractice before his amputation, Mr. Jones wrote a contradictory letter to Mr. McCahill which conceded that Mr. McCahill had **"related to me on several occasions** that you were made aware very shortly after your first surgery that the surgery was done in an improper fashion..." Exhibit 1 at page 52, line 17-p. 54, line 4. (emphasis added). Mr. Jones thereafter drafted an affidavit which falsely denied Mr. McCahill knew of Charity's medical malpractice before the July 21, 1994 settlement conference, drove to Mr. McCahill's home and had him sign it.

Mr. Jones letter to Scottsdale of September 8, 1999 is material to defendants' Motion for Summary Judgment for another reason. Mr. Jones letter, which begins with the statement that he, "must address, once again, the Exception of Prescription", once again did not address the true basis for Charity's exception of prescription. Mr. Jones refers to the May 1995 filing of Scottsdale's Petition, but not his first April 12, 1995 filing before the PCF. Exhibit R at p. 1, para. 4. Mr. Jones contends, "The April filing, as opposed to the May filing, wasn't the subject I was addressing". Exhibit V at p. 125, lines 13-25. Mr. Jones did not believe disclosing his tardy April 12, 1995

8.

filing, "was important for Scottsdale to know about..." Id at p. 127, lines 6-23. Defendants' standard for disclosing prejudicial events to their own client had shifted from "fatal" to "unimportant".

### 9. Defendants draft a false affidavit for Mr. McCahill.

On September 22, 1999, defendants filed a Memorandum in Opposition to the State's Exception of Prescription. Exhibit S. Defendants told the trial court that Mr. McCahill did not know of Charity's medical malpractice until informed by Scott Jones on July 21, 1994. Defendants' Memorandum contradicts their own correspondence of July 21, 1997, December 5, 1997 and September 8, 1999, which explained that Mr. McCahill's doctors told him of medical malpractice before his amputation.

Mr. Jones also drafted an affidavit for Mr. McCahill to sign, Exhibit T, wherein Mr. McCahill claimed he did not know of Charity Hospital's medical malpractice until the July 21, 1994 settlement conference. Exhibit V at p. 137, lines 7-23. The September 22, 1999 affidavit Mr. Jones drafted and personally hand carried to McCahill in Albany, Louisiana to sign, contradicts his September 8, 1999 correspondence relating Mr. Jones' "surprise" at Mr. McCahill's alleged admission that he knew about Charity's medical malpractice "at an early stage". Mr. McCahill confirms the affidavit Mr. Jones brought to his home to have him sign is false. Exhibit X at p. 12, line 4-p. 17, line 5; Exhibit 1 attached hereto at p. 17, line 7-p. 22, line 25. Defendants acknowledge that Mr. McCahill recently testified once again that Mr. Jones' affidavit "was inaccurate". Defendants' Memorandum at p. 7 n. The affidavit drafted by Mr. Jones for Mr. McCahill's signature was false and constitutes fraud upon the medical malpractice trial court. Defendants' filing of Mr. McCahill's affidavit with the medical malpractice trial court is legal

9.

malpractice per se.

Mr. McCahill explained that he signed the affidavit, although untrue, because, "Scott was my attorney and all he wanted me to do was sign it." Exhibit 1 at p. 21, lines 14-17. Mr. McCahill also explained several times during his December 15, 2000 deposition that he could not read the affidavit, as well as other documents. Exhibit 1 at p. 17, line 13-p. 18, line 8.

## B. ARGUMENT.

### 1. Defendants fail to even discuss dispositive issue of fraud.

At the outset, defendants' Motion for Summary Judgment creates a material issue of law by failing to mention, let alone discuss, La. R.S. 9:5605(E), which states:

> The peremptive period provided in Subsection A of this Section shall not apply in cases of fraud, as defined in Civil Code Article 1953.

La. C.C. Article 1953 provides:

> Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction.

Fraud is an exception to the three year peremptive period otherwise provided under La. R.S. 9:5605(A). *Coffey v. Labat*, 762 So.2d 1181, 1186 (La. App. 1st Cir. 2000) (reversing trial court's granting of prescription exception given fraud issue); *McCoy v. City of Monroe*, 747 So.2d 1234 (La. App. 2d Cir. 1999).

The court in *Coffey v. Labat, supra,* at 1187, in reversing the trial court's granting of a prescription exception, discussed that the inherently fact

and intent-laden issue of fraud mandates a full hearing on the merits. The court held that the trial court failed to make the necessary, "credibility determination on the issue of fraud." Id.

Defendants incorrectly state that nothing can interrupt or suspend the peremptive limitations of La. R.S. 5606(A). Defendants' Memorandum at p. 11, mid-page. Given defendants' failure to discuss this material issue of law, as well as defendants' incorrect statement of the law, defendants' Motion may be denied on this basis alone.

**2. Defendants incorrectly state legal standard for disclosure of malfeasance.**

Defendants contend that they have no duty to inform clients of actions seriously prejudicial to them unless defendants reach a subjective "reasonable belief" that their malfeasance is "fatal" to their clients' interests. Defendants err.

First, defendants cannot conceal malfeasance from their clients by unilaterally claiming a subjective belief they have not yet fatally injured their client's interests. The standard is an objective one. The Honorable G. Thomas Porteous, Jr., citing the recent U.S. Fifth Circuit Court of Appeals decision in *Curb Records, Inc. v. Adams and Reese,* described when local counsel must inform a client of legal malpractice by lead counsel.

> "...under Louisiana law, there is an inherent and nondelegable duty of care that requires local counsel to inform its client of any known malfeasance or misfeasance on the part of lead counsel, which, **to an objectively reasonable attorney,** would result in serious prejudice to the client's interest.

11.

*Curb Records, Inc. v. Adams and Reese, Inc.*, 2000 U.S. Dist. LEXIS 10463 (E.D. La. 2000). Defendants' claimed subjective beliefs do not control when they must tell their client of malpractice.

Defendants also claim that they had no duty to tell Scottsdale that they had injected a prescription issue into the case until the State of Louisiana filed a prescription exception. Defendants' Memorandum at p. 4 n. 1. Defendants err as a matter of law.

In *In re Bruscato*, 743 So.2d 645 (La. 1999), the Louisiana Supreme Court examined an attorney's failure to tell his clients he had filed their lawsuit seven days too late and, when faced with an exception of prescription, dismissed their lawsuit without prejudice. The court affirmed a 60 suspension of the respondent's license. In accord, *In re Broussard*, 660 So. 2d 818 (La. 1995) (attorney failed to timely file suit and intentionally withheld fact from client); *In re Dixon*, 650 So.2d 740, 741 (La. 1995) ( attorney did not tell client that suit prescribed for **three months** in violation of Rules 1.3, 1.4 and 1.7(b)); *In re Pardue*, 633 So.2d 150, 151 (La. 1994) (attorney's failure from 9 months to two years to tell client of prescription violates Rules of Professional Conduct 1.4 and 8.4(c)). Defendants concealed from Scottsdale the **existence** of a prescription problem for 16 months. Defendants **never** informed Scottsdale of the real reason its claim had prescribed.

**3. Defendants fraudulent concealed Scottsdale's prescription problem and how it arose.**

A misrepresentation by counsel in the context of the attorney-client relationship is fraud. *Ratcliff v. Boydell*, 674 So.2d 272, 280 (La. App. 4th Cir. 1996); *Boisdore v. Bridgeman*, 502 So.2d 1149, 1154-55 (La. App. 4th Cir. 1987). Defendants' failure to disclose the true basis for Scottsdale's

12.

prescription problem is professional misconduct in violation of Rule of Professional Conduct 8.4(c). *In re Pardue*, 633 So.2d 150, 151 ( La. 1994) (failure to inform of prescription when petition mailed 3 days before anniversary date but not filed until four days later). 8.4(c) prohibits conduct, "involving fraud, deceit, dishonesty or misrepresentation."

### 4. Defendants violated their obligation to advise Scottsdale of conflict of interest and to seek separate counsel.

The most harmful act defendants committed was their violation of defendants' obligation under Rule 1.7(b) of the Rules of Professional Conduct to advise Scottsdale to seek separate counsel due to defendants' conflict of interest. *In re Woody Dunn*, 713 So.2d 461, 463-64 (La. 1998) (citing Rule 8.4(d)); *In re Dixon,* supra, 650 So.2d at 741. For 16 months, defendants concealed from Scottsdale that its lawsuit had prescribed, and until their withdrawal as counsel in October 1999, concealed the true reason why Scottsdale's case had prescribed. Defendants denied Scottsdale the chance to promptly retain competent counsel to salvage Scottsdale's case, if necessary, by seeking redress from defendants. Defendants' continuing silence in violation of Rule 1.7(b) is a cause in fact of Scottsdale's damages.

Rule 1.7(b) and the Rules of Professional Conduct have the force and effect of law. *Saucier v. Hayes Dairy Products, Inc.,* 373 So.2d 102, 115 (La. 1979). When an attorney violates the Rules of Professional Conduct and such a breach is a cause in fact of his client's damages, the client may recover in tort. *Ratcliff v. Boydell,* supra, 674 So.2d at 279-80. The court in *Schlesinger v. Herzog,* 672 So.2d 701 (La. App. 4th Cir. 1996), affirmed the trial court's finding that an attorney committed malpractice by failing to advise his client to seek separate counsel due to the attorney's business conflicts of

13.

interest.  The court held that even the attorney's disclosure of a conflict to the client did not go far enough.  The attorney had to advise his client to seek separate counsel since the defendant attorney, "never disclosed to Schlesinger that he intended to work against him or would fail to warn him of obvious legal danger."  Id at 709-10.

**5.  Defendants' continuing conflict of interest with Scottsdale shown through unauthorized attempts to settle case.**

Defendants' conflict of interest with Scottsdale overtly manifested itself through defendants' efforts to settle Scottsdale's case without authority to do so.  On February 17, 1999, Mr. Jones wrote Charity's counsel that Mr. McCahill authorized him to settle the medical malpractice case for $38,000. Exhibit O.  Mr. Jones did not tell Scottsdale of this settlement offer.  See affidavit of Ms. Beth Brezinski, Exhibit Z1 at p.2, last paragraph.  Mr. Jones now claims his settlement offer was not really a settlement offer.  Exhibit V at p. 111, line 15-p. 114, line 15.  Mr. Jones' gymnastic semantics is contradicted by his letter of May 11, 1999 to Charity's counsel, wherein Mr. Jones writes that since Mr. Toups had not responded to his "settlement offer" of February 17, 1999, Mr. Jones had been "instructed" to withdraw "that settlement offer".  Exhibit No. 12 to Exhibit V.  Defendants' failure to keep Scottsdale informed of their settlement efforts violates Rule 1.4 of the Rules of Professional Conduct.

**6.  Defendants' filing of perjured McCahill affidavit constitutes legal malpractice as a matter of law.**

Defendants maintain that after they withdrew as counsel in October 1999, Scottsdale was free to oppose the State of Louisiana's prescription exception and continue prosecution of the medical malpractice action.

14.

Defendants' Memorandum at p. 16. Defendants err. Mr. Jones decision to induce his client, Mr. McCahill, to sign an affidavit known to be blatantly untrue, precluded Scottsdale from opposing the State of Louisiana's prescription exception without itself participating in a fraud upon the trial court. Mr. Jones subornation of Mr. McCahill is a separate act of legal malpractice for which no prescription issue exists.

## CONCLUSION

Unbeknownst to Scottsdale, defendants relationship with their client, Scottsdale, has been tainted five years of deception. Once defendants' caused Scottsdale's medical malpractice case to prescribe, defendants chose to conceal the fact from Scottsdale. Defendants are liable not only for their initial legal malpractice, but also for their continuing violations over the past five years of Rules of Professional Conduct 1.3, 1.4, 1.7(b) and 8.4(c).

Defendants' Motion for Summary Judgment indicates that defendants are apparently unaware that their fraudulent concealment of the foregoing renders, under La. R.S. 9:5605(E), the prescriptive periods provided under Subsection A inapplicable to this case. Based upon the foregoing, Scottsdale prays that defendants' Motion for Summary Judgment be denied.

15.

Respectfully submitted,

Mark L. Ross, Bar No. 11477
Attorney for Scottsdale
  Insurance Company
600 Jefferson Street, Suite 501
Lafayette, Louisiana 70501
Telephone (337) 266-2345
Facsimile: (337) 266-2163

## LR 5.3 CERTIFICATE OF SERVICE

I certify that on this 11th day of January , 2001, a copy of the foregoing pleading has either been hand delivered or mailed to all counsel of record by depositing same the United States mail, postage prepaid and properly addressed.

MARK L. ROSS

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| SCOTTSDALE INSURANCE | * | CIVIL ACTION: |
| COMPANY | * | # 00-225 |
| | * | |
| VERSUS | * | MAGISTRATE: 4 |
| | * | |
| SCOTT G. JONES, ESQ. | * | |
| HULSE & WANEK, P.L.C. | * | |
| AND XYZ INSURANCE CO. | * | |

Deposition of **VAN LAUREN McCAHILL**, taken at
the offices of Affirmative Court Reporting
Services, 606 E. Morris Avenue, Suite D,
Hammond, Louisiana, on Friday, December 15,
2000, commencing at or about 3:37 p.m.

Reported by:

    Jamie L. Terrio, CVR, CCR
    Certified Court Reporter

COPY

1

17

1    medical malpractice case?

2        A.  No.  We didn't.

3        Q.  Let me show you a document which I'm

4    going to mark as Exhibit 2.  (Tendering

5    document)

6        A.  Okay.

7        Q.  This is entitled, Affidavit of Van

8    Lauren McCahill.  And at the bottom, you can

9    see the date of September 22, 1999.  Do you

10   remember signing this affidavit?

11       A.  That's my handwriting.  Like I say, I'm

12   not good with dates.

13       Q.  Okay.  Well, do you  remember you were

14   indicating that you had a meeting with Mr.

15   Jones where you signed an affidavit?

16       A.  That was -- that must have been the

17   day, then.

18       Q.  Do you recognize this paper?

19       A.  I can't see.  I don't have my glasses

20   on.  I can't see this paper good.

21       Q.  But the date, September 22, 1999, does

22   that sound about --

23       A.  That sounds about right.

24       Q.  -- right?

25       A.  About right.

1    Q.  Let's go through a couple of them.  If

2    you're having trouble reading them, I'll read

3    them out to you.

4         Well, I guess -- you can't read it?

5    A.  Not really.

6    Q.  All right.  Let me read the whole

7    thing, then.  After the preliminary, the body

8    of it, it says: (reading from document)

9         I was injured as a result of an

10   accident that occurred on February 29th, 1992

11   when I fell from a balcony located at 1539

12   Euterpe Street in New Orleans, Louisiana.  This

13   fall, which occurred as a result of a broken

14   handrail on the balcony, caused me to fracture

15   my ankle.

16        Subsequently, I received treatment at

17   Charity Hospital in New Orleans.  During the

18   entire course of my treatment at Charity and

19   even through the time my leg was amputated, I

20   was under the belief that I was receiving

21   adequate and competent medical treatment by the

22   various physicians who treated me through

23   Charity Hospital.

24        Eventually on July 21, 1994, I entered

25   into a settlement agreement with the

19

1    defendants, who I had sued as a result of the

2    fall from the balcony.  At that time, I became

3    aware for the first time upon discussing this

4    matter with my current attorney, that there may

5    have been some negligence on the part of

6    various physicians at Charity Hospital in

7    causing my leg to be amputated.

8             Accordingly, I had no knowledge or any

9    reason to suspect negligence on the part of the

10   physicians at Charity until such information

11   was passed on to me at the time of the

12   settlement conference of July 21, 1994 when I

13   executed the Receipt and Release of my original

14   lawsuit.

15            And then it goes on to say that this

16   statement was true and correct to the best of

17   my knowledge and was signed in Baptist,

18   Louisiana on the 22nd day of September 1999.

19        A.  That's the affidavit that he had me

20   sign?

21        Q.  Well, I guess so.

22        A.  I told you that I've got the flu.  My

23   head -- I'm groggy and I'm trying.

24        MR. ROSS:

25             Are you on any medication?

20

```
1          THE WITNESS:

2               Yes.

3    BY MR. WRIGHT:

4        Q.  What medication are you on?

5        A.  I don't even know the name of it.  It's

6    some blue thing.  It's supposed to clear your

7    congestion up and your cold.

8        Q.  Well, we had asked before and I had

9    said does September 22, 1999 sound about the

10   time that he came and visited you and had you

11   sign an affidavit and you said yes.  So I'm

12   assuming and I think it's safe for you to

13   assume that this is the affidavit that was

14   signed on that occasion.

15           Let's go over a couple of things in

16   this affidavit.

17       A.  Okay.

18       Q.  One sentence that I read to you before

19   says that: (reading from document)

20           Subsequently, I received treatment at

21   Charity Hospital.  During the entire course of

22   my treatment at Charity and even through the

23   time my leg was amputated, I was under the

24   belief that I was receiving adequate and

25   competent medical treatment by the various
```

1    medical physicians who treated me through

2    Charity Hospital.

3         Is that true?

4         A.  Well, do you remember a few minutes

5    ago when I told you that Dr. Burvant and Dr.

6    Adatto -- now when I'm talking about Dr.

7    Burvant, he was the one that did the original

8    surgery on my leg.  And I'm talking about just

9    a couple of years later because I went to

10   Charity off and on for two or three years that

11   he told me that they messed up.

12        And do, evidently as I told you a few

13   minutes ago, that's the way it was.  Now what's

14   on there -- like I say, Scott was my attorney

15   and all he wanted me to do was to sign it.

16   That's all he got there and he wanted me to

17   sign it.

18        And I read it, but I don't have -- I

19   don't have -- I did read it.  But as far as me

20   telling you what was on there, especially right

21   now, I mean, I can't say word-for-word what's

22   on that paper.

23        Q.  Well then, my question is: Is this

24   statement true?  This statement in your

25   affidavit.  And I'll read it to you again if

22

1    you want.  Do you want me to read it again?

2         A.   Yes.  I want to make sure I understood

3    it.

4         Q.   (Reading from document) Subsequently, I

5    received treatment at Charity Hospital in New

6    Orleans.  During the entire course of my

7    treatment at Charity and even through the time

8    that my leg was amputated, I was under the

9    belief that I was receiving adequate and

10   competent medical treatment by the various

11   physicians who treated me through Charity

12   Hospital.

13        A.   That's not true.

14        Q.   All right.  And it's not true because

15   of what you just testified that you had talked

16   to some doctors?

17        A.   Like I said, he was my attorney.  I

18   trusted him.  He was my attorney.  And I might

19   have just glanced over it and everything.  But

20   the truth is -- the truth is that I felt like

21   something was wrong when Dr. Burvant first

22   brought this up to me and then Dr. Adatto.

23   That's not true.  I mean, you're talking about

24   a year or two after the surgery.  Dr. Burvant

25   brought this up.

1    issue or make arrangements to have him

2    available at the time of the hearing to offer

3    testimony on the prescription issue.

4         Do you remember getting this letter?

5    A.   No.  I don't.  I don't remember getting

6    no letter like that.

7    Q.   Do you deny that you got this letter?

8    A.   Right.

9    Q.   Were you aware of the Exception of

10   Prescription that had been filed by Charity in

11   the time frame of July 1996?

12   A.   No way.  The first time that I knew

13   about a prescription, Scott mentioned it to me

14   last year.  Last year, early in the year, I

15   would say is the first time that he ever

16   brought up the prescription.

17   Q.   So you deny receiving this letter of

18   July 1996?

19   A.   Yes.  I don't recall a letter like

20   that.

21   Q.   Do you remember talking to Scott about

22   going to court to appear and testify in

23   connection with a hearing?

24   A.   You're talking about the one where he

25   come and deliver me the affidavit?

40

1          Q.   No.   I'm talking about in 1996.   The

2     affidavit that we looked at before was in 1999.

3          A.   Appearing at a hearing?

4          Q.   Yes?

5          A.   Never did.

6          Q.   Do you remember talking to him about

7     appearing at a hearing?

8          A.   Never did talk to him about it.

9          Q.   Let me show you a document which I'm

10    going to mark as Exhibit 6.   This is a letter,

11    it looks like the same day -- I'm sorry.

12               Yes.   It's the same day.   It's July 19,

13    1996.   It says (reading from document):

14               Enclosed is the original affidavit,

15    which I would ask that you please sign and

16    return to me in the self-addressed, stamped

17    envelope.   Please call me if you have any

18    questions at all.

19               Do you remember getting an affidavit

20    back in July of 1996?

21         A.   I sure don't.

22         Q.   There's the address on this one is 500

23    Mariner's Plaza, Suite 204, Mandeville.   What's

24    that address?

25         A.   That's where I was staying.   I was

1  working over there telemarketing, too.

2      Q.  Apple Street was --

3      A.  I was working.

4      Q.  When you were working in Norco, where

5  were you living?

6      A.  I was living in Metairie.

7      Q.  Were you living in Mandeville at the

8  same time that you were working in Norco?

9      A.  No, sir.  I'd never drive from

10  Mandeville to Norco.

11      Q.  The Mariner's Plaza, that was where you

12  worked?  That wasn't where you were living?

13  That's where you were working?

14      A.  No.  Well, yes.  That's right.  I was

15  doing telemarketing there.  Yes.  That rings a

16  bell.  Yes.  Mariner's Plaza.  Yes.  I was

17  doing telemarketing in Mandeville.

18      Q.  Where were you living, then?

19      A.  I was living in Hammond.  I was driving

20  in from Hammond.

21      Q.  Where in Hammond?

22      A.  Well, sir, like I told you, I move a

23  lot.  And you're talking about four years ago.

24  I move a lot.

25      Q.  Do you deny receiving an affidavit from

42

1    Scott Jones in July of 1996?

2         A.  Well, let's put it this way: I can't

3    100 percent say I deny it.  But I usually got a

4    pretty good memory and I don't never remember

5    getting anything like this in the mail and

6    mailing anything back to Scott.

7              Now if it so happens if I did and if it

8    comes back that I did, it's not because I'm

9    lying.  It's because I'm misjudging.  But I

10   don't -- when Scott sent me mail, I didn't have

11   to mail anything back to him or anything.

12             Now, he did send me mail.  But never

13   did I have to send anything back to him to sign

14   or whatever.

15        Q.  Let me show you a document which I've

16   marked as Exhibit 7.  This is an affidavit, an

17   unsigned affidavit.  As you can see on the last

18   page below your signature, it says (reading

19   from document):

20             Sworn to and subscribed before me this

21   blank day of July 1996?

22        A.  Uh-huh.

23        Q.  Do you remember seeing an affidavit

24   like this during the Summer of 1996?

25        A.  You're talking about the second page?

43

1      Q.  Well, the second page is where I have

2   the date.  What I'm talking about is the

3   two-page document.

4      A.  Where are you looking at right now?

5      Q.  And my question is: Do you remember

6   seeing this affidavit or an affidavit that you

7   remember during the Summer of 1996?

8      A.  I don't have my glasses.  If I knew I

9   needed them, I would have took them.

10     Q.  Do you want to borrow mine?  I'm

11  serious.  (Handing eyeglasses to the witness)

12  Can you see it?

13     A.  Yes, sir.  That's a lot better.

14  (Peruses document) All this says is what we

15  done talked about already.

16     Q.  Well, the affidavit that I showed you

17  before and you can pull it out of the pile

18  right here, Exhibit 2, is dated July -- I'm

19  sorry, it's September of 1999.

20     A.  Okay.

21     Q.  This one has a date of July 1996 on the

22  second page.  (Indicating)

23     A.  And my question to you is: Do you

24  remember seeing such an affidavit during the

25  Summer of 1996?

1        A.    Well, yes.    I remember one like this.

2        Q.    What was your understanding as to the

3    reason that an affidavit was prepared in July

4    1996?

5        A.    I guess because he was preparing -- I

6    mean, my thinking was he was preparing to go

7    ahead with filing the suit.    That's the only

8    thing that I can think of.

9        Q.    Did you come to any understanding

10    during 1996 that he was asking you to sign an

11    affidavit because of a prescription issue in

12    the malpractice case?

13        A.    There was never any prescription issue

14    mentioned to me until last year.

15            MR. ROSS:

16                "Last year" is 1999?

17            THE WITNESS:

18                Right.

19    BY MR. WRIGHT:

20        Q.    The medical malpractice case was

21    ultimately settled for $15,000?    Correct?

22        A.    Right.

23        Q.    And when was it -- and that was in

24    January of this year?    Right?    Of 2000?

25        A.    Yes, sir.

1    I'm going to mark as Exhibit 8.  This is a

2    letter dated August 9, 1999.  And it's from

3    Scott to Beth Brezinski with a carbon copy to

4    you indicated.  And my question is going to be:

5    Do you remember receiving this?

6        A.   (Peruses document) And this is when?

7    What date?

8        Q.   August 9, 1999?

9        A.   I don't remember getting a letter.  I'm

10   not saying that I didn't, but I don't remember.

11   I'm not saying that I didn't.  I can't answer

12   you.  I've gotten about a million letters.

13       Q.   Do you know where you were living in

14   August of 1999?

15       A.   Yes.  I was living on Coleman Park Road

16   in Baptist.

17       Q.   Let me show you a letter that's dated

18   September 8, 1999, which I'm going to mark as

19   Exhibit Number 9.  This is addressed to you at

20   P. O. Box 1979 in Albany.

21       A.   (Peruses document) Yes.  That's -- that

22   was my mailing address when I was living in

23   Baptist.

24       Q.   Do you remember getting this letter?

25       A.   No.  I don't.

53

1          Q.   Do you deny receiving this letter?

2          A.   Yes, sir.

3          Q.   You deny it?

4          A.   Yes, sir.  I don't remember getting

5     this letter.

6          Q.   All right.  Let's take parts of the

7     letter.  I'm going to have to have my glasses

8     back.

9          A.   Okay.

10         Q.   I'm going to read to you --

11         A.   Let's put it this way.  I'm going to

12    say the same thing that I told you a few

13    minutes ago: I'm not going to sit here and say

14    that I didn't because I can't remember all of

15    the letters that I got.  I will tell you that I

16    don't remember.

17         Q.   All right.  It says (reading from

18    document):

19              Enclosed is your copy of the Exception

20    of Prescription filed by Charity Hospital.

21    Upon further review of the Exception and based

22    on our recent discussions, I find myself now

23    somewhat concerned about this Exception.

24    Specifically, you have related to me on several

25    occasions that you were made aware very shortly

1     after your first surgery that the surgery was

2     done in an improper fashion because the proper

3     amount of plates and screws were not used.

4          Accordingly, that makes for a good

5     argument that you were aware of the malpractice

6     sometime back in 1992 following the first

7     surgery in February.  If that was the case,

8     then a malpractice action should have been

9     initiated back in February or March of 1993.

10          Obviously, I was not even able to

11     commence this action until May of 1995 because

12     I did not have an attorney/client relationship

13     with you until shortly before that time.

14          Do you remember having either any

15     discussions or receiving the information?

16     A.   I'm going to say now that you've read

17     it and you've clarified it for me, I'm going to

18     say that I never received a letter like that.

19          He said that he -- we talked off and

20     on.  But like he's right.  The last couple of

21     years and mainly since the last part of '99, we

22     talked sparingly before that.  But since '99 --

23     in '99 is when all of the action started coming

24     up, that's when we really started talking on

25     the phone every other day or every day.

STEWART, JR.
RANDALL E. KLEINMAN
JOSEPH G. GALLAGHER, JR
STEPHEN A. WILTABAH
CHARLES M. PONDER III
SCOTT G. JONES
GWENDOLYN S. HEBERT
CYRIL G. LOWE, JR
KAREN L. LEWIS
ROGER D. MARLOW

NEW ORLEANS LOUISIANA
(504) 524-6231
FAX (504) 529-4106

404 E. GIBSON STREET
SUITE A
COVINGTON, LOUISIANA 70433-2926
(504) 892-4953
FAX (504) 893-2932

OF COUNSEL
JOHN R. SCHUPP
CALLENDER F HADDEN, JR

WEB www.hulsewanek.com
e-mail dh@hulsewanek.com

PLEASE RESPOND TO
NEW ORLEANS OFFICE

September 8, 1999

Mr. Van L. McCahill
P. O. Box 1979
Albany, LA  70711

    RE:    Van McCahill, et al v.
           The La. Health Care Authority
           Our File: 274-5439

Dear Van:

    Enclosed is your copy of the Exception of Prescription filed by Charity Hospital. Upon further review of the Exception, and based on our recent discussions, I find myself now somewhat concerned about this Exception. Specifically, you have related to me on several occasions that you were made aware, very shortly after your first surgery, that the surgery was done in an improper fashion because the proper amount of plates and screws were not used. Accordingly, that makes for a very good argument that you were aware of malpractice sometime back in 1992 following the first surgery in February. If that was the case, then a malpractice action should have been initiated back in February or March of 1993. Obviously, I was not able to even commence this action until May of 1995 because I did not have an attorney client relationship with you until shortly before that time.

    The bottom line from this is that I am deeply concerned, now, that the State may have a good argument on this Exception. Accordingly, in that regard, I have recommended to Scottsdale Insurance Company that I be given authority to negotiate a settlement for as much as I can obtain. I have also indicated to Scottsdale Insurance Company your desire to settle the case, with the hopes that we could possibly recover most or all of the medical bills that you paid out of your prior recovery.

**EXHIBIT**

9

Please call me once you receive this so that we can discuss it further and, hopefully, I will be able to let you know in the near future what direction I have been given from Beth Brezinski, the claims handler for this at Scottsdale.

Sincerely,

Scott G. Jones

SGJ/gh
Enclosure

## UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **SCOTTSDALE INSURANCE COMPANY** | **CIVIL ACTION NO. 00225** |
| **vs.** | **SECTION "F"** |
| **SCOTT G. JONES, ESQ., HULSE AND WANEK, PLC AND XYZ INSURANCE COMPANY** | **MAGISTRATE DIVISION (4)** |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## SHORT AND CONCISE STATEMENT OF MATERIAL FACTS AS TO WHICH SCOTTSDALE INSURANCE COMPANY CONTENDS THERE IS A GENUINE ISSUE TO BE TRIED PURSUANT TO LOCAL RULE 56.2

**NOW COMES** Scottsdale Insurance Company (hereinafter "Scottsdale"), through undersigned counsel, and pursuant to Local Civil Rule 56.1, outlines those issues of material fact as to which Scottsdale contends there exists a genuine issue to be tried. Plaintiff will refer to Exhibits as they were identified and attached to plaintiff's Motion for Summary Judgment previously filed on June 27, 2000.

### Number 3.

Mr. McCahill was not originally represented by Nahum Laventhal, Esq. in a personal injury action. Mr. Michael Hingle, Esq. originally represented Mr. McCahill, while Mr. Laventhal represented Scottsdale Insurance Company.

### Number 6

On July 21, 1994, Mr. Jones settled Mr. McCahill's personal injury action against Scottsdale for $600,000. Exhibit D. Defendants omit that Mr. Jones broached to Mr. McCahill and his attorney, Michael J. Hingle, the prospect of pursuing a medical malpractice case against Charity to recover the settlement funds Scottsdale paid Mr. McCahill. However, Mr. McCahill made no response of any kind. Mr. Jones did not ask Mr. McCahill, nor did Mr. McCahill state, if or when Mr. McCahill had become aware that Charity Hospital had committed medical malpractice against him. Exhibit V at p. 67, line 15-p. 68, line 14. Mr. Jones claims since he did not ask Mr. McCahill when he first became aware that Charity Hospital rendered him substandard care, that Mr. McCahill therefore did not know of Charity's medical malpractice until the July 21, 1994 settlement conference.

After the July 21, 1994 settlement conference, Mr. Jones did not speak with Mr. McCahill about the medical malpractice case again until some time after he drafted and filed Scottsdale's medical malpractice Petition for Damages against Charity with the Patient's Compensation Fund on April 12, 1995. Exhibit V at p. 37, line 9-p. 38, line 16. Mr. Jones now contends that his lack of due diligence in speaking to Mr. McCahill justified his concealment from Scottsdale of his late and faulty filing of their medical malpractice Petition.

### Number 8.

Defendants' suggested uncontested statement number 8 is incorrect given its several material omissions.

April 10, 1995 was the one year anniversary of Mr. McCahill's left leg amputation. Mr. Jones did not intend to file a Petition invoking a Medical Review Panel on May 26, 1995. Instead, Mr. Jones planned to file

Scottsdale's medical malpractice Petition before April 10, 1995 to preclude the State of Louisiana from arguing the Petition had to be filed within one year of Mr. McCahill's amputation.  Exhibit V at p. 48, line 21-p. 49, line 21; Letter from Scott Jones to Ms. Deborah G. Gildener dated February 6, 1995, 2d para. Exhibit W.

Defendants also incorrectly suggest that defendants originally filed Scottsdale's Petition with the Commissioner of Administration on May 26, 1995.  In truth, Mr. Scott Jones and Hulse and Wanek not only failed to timely file Scottsdale's medical malpractice Petition, but also filed with the Patients Compensation Fund, the wrong entity.  Exhibit G; Exhibit V at p. 49, line 22-p. 50, line 9.

Mr. Jones erroneously believed and reported to Scottsdale that all medical malpractice Petitions were filed with the PCF.  See Exhibit W at p. 1, para 2.  Mr. Jones did not know where to file Scottsdale's medical malpractice Petition because Mr. Jones had never before acted as plaintiff's counsel in a medical malpractice action.  Exhibit V at p. 7, lines 15-23.

At some point, Mr. Jones became aware that the Division of Administration, and not the PCF, was the correct body with which to file a medical malpractice Petition against Charity.  Exhibit V at p. 52, lines 14-19. Mr. Jones never wrote or otherwise informed Scottsdale that he filed Scottsdale's medical malpractice Petition with the wrong entity.  Likewise, Mr. Jones never wrote Scottsdale that he **intended** to file Scottsdale's medical malpractice Petition on April 10, 1995, but did not do so until April 12, 1995.

On May 26, 1995, 46 days after the one year anniversary of Mr. McCahill's amputation, defendants refiled Scottsdale's medical malpractice Petition against Charity before the Division of Administration.  Exhibit H.

Defendants never advised Scottsdale that it should consider seeking separate counsel due to their late filing of Scottsdale's Petition before the wrong entity. Exhibit V at p. 86, lines 14-21.

### Numbers 11 and 12.

Defendants' opposition brief affirmatively misled Mr. Kannally about defendants' failure to timely and properly file Scottsdale's medical malpractice Petition. The brief defendants sent to Scottsdale's Mr. Kannally, Exhibit B to the Defendants' Motion for Summary Judgment, inaccurately states at page 2, bottom paragraph, that, "Thereafter, Mr. McCahill promptly filed his claim herein on May 26, 1995." Defendants' brief misled Scottsdale by omitting any reference to their late filing of Scottsdale's Petition before the wrong entity on April 12, 1995. Defendants' brief in turn mislead Scottsdale as to the true merits of the State of Louisiana's exception motion. Mr. Jones did not send Mr. Kannally the State of Louisiana's brief since that brief would have told Scottsdale about defendants late and faulty filing of Scottsdale's Petition. Defendants' statement at page 6 of Defendants' Memorandum that on July 16, 1999, defendants, "**Again**,...sent a copy of the State's Exception of Prescription to Scottsdale", is therefore not true. (emphasis added).

Equally material, Mr. Jones did not send Scottsdale's Mr. Kannally a cover letter or report explaining the actual facts and law relating to the State of Louisiana's prescription exception. Mr. Jones' decision not to explain to Mr. Kannally, a Phoenix, Arizona based insurance examiner, the intricacies of Louisiana medical malpractice and prescription law, clouded, as Mr. Jones intended, Scottsdale's appreciation of Mr. Jones' legal malpractice.

As an uncontested fact, Scottsdale did not know that any prescription issue existed in its medical malpractice action between April 10, 1995 and July 19, 1996, or approximately 16 months. Scottsdale did not know until

October 1999 the real basis of the prescription issue due to defendants' concealment of the true facts from their client.

### Number 16.

Mr. Jones' January 24, 1996 letter did not advise Scottsdale of the true basis for a prescription exception which Mr. Jones anticipated the State of Louisiana would file.  As with every other communication from defendants to Scottsdale which claimed to discuss the prescription issue, defendants' January 24, 1996 letter misled Scottsdale by omitting any reference to the actual facts supporting the State of Louisiana's prescription exception.  Mr. Jones maintains that he, "didn't think that it warranted any discussion". Exhibit V at p. 82, line 10-p. 83.

### Number 17.

Defendants contend that Mr. McCahill "was now claiming" in 1997 that two treating physicians, Drs. Ken Adatto and John Burvant, acknowledged that Mr. McCahill had received below standard medical treatment at Charity Hospital.  In fact, Mr. McCahill had never denied to Mr. Jones his knowledge of medical malpractice prior to his amputation. Whenever Mr. McCahill telephoned Mr. Jones to find out about the glacial movement of the medical malpractice litigation, Mr. McCahill consistently told Mr. Jones of his knowledge of medical malpractice before the amputation.

Mr. Jones had always known of Charity Hospital's pre-amputation medical malpractice independently of Mr. McCahill.  The medical malpractice Petition defendants drafted alleges detailed acts of medical malpractice leading up to Mr. McCahill's amputation.  Mr. Jones gleaned Charity Hospital's pre-amputation medical malpractice from its medical records.  See Exhibit G at Paragraphs 8, 10, 11, 12, 13, 14 and 15.  Mr.

Jones' claim that Mr. McCahill surprised him by "announcing" that he knew of pre-amputation medical malpractice is repudiated by every document in this case.

### Number 18.

On February 17, 1999, Mr. Jones wrote Scottsdale that given Mr. McCahill's "questionable character", Scottsdale should settle its $600,000 medical malpractice claim for $38,000.  Mr. Jones continued to withhold from Scottsdale the true problems in the case stemming from his late and faulty filing of Scottsdale's Petition.  In addition, unbeknownst to Scottsdale, Mr. Jones wrote counsel for Charity that Mr. McCahill authorized him to settle the medical malpractice case, "for a return of the medical bills which he paid", or $38,000.  Exhibit O.  Scottsdale did not know about, let alone authorize, this settlement offer.  Scottsdale did not receive from Mr. Jones a copy of his settlement proposal to the State of Louisiana.  Scottsdale only received a copy of Mr. Jones' settlement proposal to the State of Louisiana by requesting same from the State of Louisiana's counsel.

### Numbers 19-20

On August 9, 1999, Mr. Jones wrote Scottsdale's recovery specialist, Ms. Beth Brezinski, that Charity had filed an Exception of Prescription. Exhibit Q.  On September 8, 1999, Mr. Jones falsely wrote Scottsdale's Ms. Brezinski that "[T[o my surprise", Mr. McCahill "admitted" he was aware very early on that he had not received adequate medical care at Charity. Exhibit R at p. 1 para. 2.  In truth, Mr. McCahill had consistently told Mr. Jones over the years of his knowledge of pre-amputation medical malpractice. Mr. Jones September 8, 1999 letter, Exhibit R, actually repeats Mr. McCahill's "pre-amputation" knowledge of medical malpractice previously

discussed in Mr. Jones' correspondence of July 21 and December 5, 1997. Exhibits K and L.

Although Mr. Jones' September 8, 1999 letter professed to discuss prescription, Mr. Jones still did not tell Scottsdale he had filed Scottsdale's original medical malpractice Petition two days too late and before the wrong entity. Mr. Jones did not deem such information important. Exhibit V at p. 126, line 15-p. 128, line 23. Scottsdale thereby continued to be misled about the actual facts underlying the State of Louisiana's prescription motion. Similarly, Mr. McCahill in turn did not know any prescription issue existed until September 1999. Sworn Statement of Van Lauren McCahill taken on January 21, 2000 at p. 12, lines 4-25. Exhibit X.

In connection with Mr. Jones' opposition to the State of Louisiana's prescription exception, Mr. McCahill recalled that Mr. Jones came to his home and asked him to sign an Affidavit, Exhibit T. Id at p. 14, line 8-p. 15, line 4. When read to him, Mr. McCahill testified the Affidavit Mr. Jones had him sign was false. Id at p. 15, line 5-p. 17, line 5. Defendants acknowledge that Mr. McCahill more recently testified once again that Mr. Jones' affidavit "was inaccurate". Defendants' Memorandum at p. 7 n. 3.

### Number 20

On October 12, 1999, Mr. Jones wrote Scottsdale that Mr. McCahill wanted to accept a pending $15,000 settlement offer from Charity. Exhibit V at p. 142, line 11-23; Exhibit 13 to Exhibit V. Mr. Jones also reported he had a conflict between his representation of Mr. McCahill and Scottsdale and therefore withdrew as Scottsdale's counsel. Mr. Jones claims he never had a conflict of interest representing Scottsdale because, in sharp contradiction to his letter of September 8, 1999, he now claims the State of Louisiana's

prescription exception was without merit.  Exhibit V at p. 142, line 20-p. 143, line 13.

Respectfully submitted,

Mark L. Ross, Bar No. 11477
Attorney for Scottsdale
Insurance Company
600 Jefferson Street, Suite 501
Lafayette, Louisiana  70501
Telephone  (337) 266-2345
Facsimile: (337) 266-2163