FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2001 JAN 16  PM 4: 06

LORETTA G. WHYTE
CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| SCOTTSDALE INSURANCE COMPANY | * | CIVIL ACTION NO. 00-0225 |
| VERSUS | * | SECTION "F" |
| SCOTT G. JONES, ESQ., HULSE AND WANEK, PLC AND XYZ INSURANCE COMPANY | * | MAGISTRATE (4) |

* * * * * * * * * * * * * * * * * * * * * * * * * * *

DEFENDANTS' OPPOSITION TO
SCOTTSDALE INSURANCE COMPANY'S
MOTION FOR SUMMARY JUDGMENT THAT
FILING FALSE AFFIDAVIT IS LEGAL MALPRACTICE AS A MATTER OF LAW

MAY IT PLEASE THE COURT:

Scott G. Jones ("Jones") and the law firm of Hulse & Wanek, PLC ("H&W"), defendants herein, submit the following Opposition to Scottsdale Insurance Company's Motion for Summary Judgment That Filing of False Affidavit is Legal Malpractice as a Matter of Law. The hearing on Scottsdale's Motion is set for January 24, 2001.[1]

---

[1] Defendants must take this opportunity to note that Plaintiff noticed the hearing on its Motion for January 24, 2001 despite the clear mandate of the Court's Pre-Trial Order stating that all pre-trial motions shall be filed and served in sufficient time to permit hearing thereon no later than 30 days prior to the trial date. The trial on this matter is set for February 12, 2001. Thus, Plaintiff's

A.  **INTRODUCTION**

This is an action for legal malpractice brought by Scottsdale Insurance Company ("Scottsdale") against its former counsel, Scott G. Jones ("Jones"), and the law firm of Hulse & Wanek, PLC ("H & W"). Scottsdale alleges that Jones allowed Scottsdale's cause of action for medical malpractice to prescribe while he was representing Scottsdale and that Jones "tried to conceal the true basis of prescription." Scottsdale now argues in its Motion for Summary Judgment that it is entitled to a determination that the Affidavit of Mr. Van McCahill ("McCahill") dated September 22, 1999, filed in opposition to the State of Louisiana's Exception of Prescription in the underlying medical malpractice matter is false and that by filing this Affidavit, Defendants in the above-captioned committed legal malpractice as a matter of law.

As a threshold matter, it is unclear exactly what relief Scottsdale is seeking from this Court. It appears that Scottsdale is seeking some sort of advisory opinion or declaratory judgment, which fails as a matter of law to articulate a claim for legal malpractice.

Further, there are numerous issues of fact outstanding relating directly to Scottsdale's claim that Jones knowingly filed a false affidavit. First, there are issues of fact relating to whether the content of the Affidavit is false. As this Court has already found, there are genuine issues of material fact as to when McCahill "discovered" the claim for medical malpractice. McCahill now claims that the Affidavit he signed in September of 1999 stating that he was unaware of a medical malpractice claim until July 21, 1994 is false; however, at the time he signed the Affidavit McCahill verified to

---

Motion is not timely and according to the Court's Pre-Trial Order shall be deemed waived unless good cause is shown.

Jones that it contained the truth as to when McCahill discovered a claim for medical malpractice. Second, there is no evidence that Jones "induced" McCahill to sign the Affidavit or that Jones believed that the Affidavit contained anything other than the truth. Jones cannot be found summarily liable in hindsight based on McCahill's continually changing version of what is or is not the truth relating to his knowledge of a claim for medical malpractice.

Finally, if Scottsdale is correct in arguing that the McCahill knew about the medical malpractice claim during the initial follow up to his surgery which occurred in March of 1992, the medical malpractice claim would have prescribed before Jones was retained to represent Scottsdale in June of 1994. Accordingly, Scottsdale is not entitled to judgment as a matter of law and its Motion for Summary Judgment should now be DENIED.

**B.   FACTS**

Defendants offer the following statement of facts in order to traverse that set forth in Scottsdale's "Short and Concise Statement of Material Facts as to Which Scottsdale Insurance Company Contends There is no Genuine Issue to be Tried" and to clarify and articulate additional facts necessary to understand the source of this litigation:

**1.   *McCahill v. Scottsdale Insurance Co.***

On February 29, 1992, Van Lauren McCahill ("McCahill") fell off the balcony of an apartment located at 1539 Euterpe Street, New Orleans, Louisiana, allegedly as a result of a defect in the balcony's hand rail. McCahill fell to the ground and fractured his ankle. For the next two years McCahill was continuously treated by doctors at Charity Hospital. On April 10, 1994, McCahill's left leg was amputated below the knee. (Complaint, ¶7).

In September of 1992, McCahill filed a suit for damages against Michael Mayer, III and Mayer Investments, the owners of the Euterpe Street property, and their insurer, Scottsdale Insurance Company (the "*McCahill v Scottsdale* matter"). The defendants to the *McCahill v Scottsdale* matter were initially represented by Mr. Nahum Laventhal, Esq., an attorney appointed by Scottsdale as the owners' insurer. (Complaint, ¶6). On or about June 24, 1994, Jones, defendant herein, was substituted as counsel for the defendants. At that time Scottsdale was attempting to negotiate a settlement with McCahill. Around this time Scottsdale had also undertaken investigating the possibility of a medical malpractice claim against Charity Hospital in an effort to recoup any monies ultimately paid to McCahill. (Complaint, ¶10).

On July 21, 1994, the *McCahill v Scottsdale* matter settled for $600,000.00. (Complaint, ¶11). At a July 21, 1994 settlement conference Jones, McCahill and McCahill's attorney, Mr. Michael Hingle ("Hingle"), discussed the possibility of filing a medical malpractice claim against Charity Hospital. Hingle indicated that they would consider it. Neither McCahill nor Hingle stated to Jones that they had considered the possibility of medical malpractice prior to this date. (*See*, Excerpts of Deposition of Scott Jones, attached hereto as Exhibit 1, pp. 22-24, pp. 89-90).

2. ***McCahill v. The Louisiana Health Care Authority Medical Center of Louisiana at New Orleans a/k/a Charity Hospital of New Orleans***

   A.  **Review Panel Proceeding and First Exception of Prescription**

On April 5, 1995, McCahill and Scottsdale entered into a Litigation Agreement whereby they agreed to file a claim for medical malpractice, with Scottsdale taking the lead, and split any recovery (75% to Scottsdale and 25% to McCahill). (Complaint, ¶13). By correspondence dated May 26, 1995, a Petition invoking a Medical Review Panel was forwarded to the Commissioner of

Administration for filing therewith. (Complaint, ¶15). The Petition was apparently received on June 1, 1995.[2]

During the pendency of the Review Panel proceeding, the State of Louisiana filed an Exception of Prescription on behalf of Charity Hospital. On or about July 19, 1996, Jones filed an Opposition to the State of Louisiana's Exception of Prescription. Jones opposed the Exception on the basis that McCahill could not have known of the malpractice until July 21, 1994, the date of the Scottsdale settlement.[3] Mr. Rick Kannally ("Kannally"), the Scottsdale adjuster appointed to the matter, was copied on the July 19, 1996, letter to the Clerk of Court filing Scottsdale's Opposition to the State of Louisiana's Exception, which was noted on Scottsdale's "Note Pad" relating to the matter. The State did not push its Exception to a hearing. On October 23, 1996, the Medical Review Panel returned a decision that there was no deviation from the standard of care by the Charity Hospital doctors.

---

[2] In an effort to discredit defendants, Scottsdale has accused Jones of intentionally hiding information relating to the State of Louisiana's prescription defense. As its evidence thereof, Plaintiff repeatedly states that the Petition invoking a Medical Review Panel was initially filed with the Patients Compensation Fund and that Jones hid this from Scottsdale. However, Jones always felt that the operative date he was working with was the date McCahill "discovered" the alleged medical malpractice, which he believed to be July 21, 1994, the date of the settlement conference in the *McCahill v. Scottsdale* matter. Accordingly, he reasonably believed that whether the Petition was filed in April or May of 1995 was not fatal to the medical malpractice action. (Exhibit 1, pp.66 and 67).

[3] La. R.S. 9:5628 provides that an action for medical malpractice must be brought within a year of the date of the alleged act, omission or neglect *or* within one year from the date of discovery of the alleged act, omission or neglect. In all events the claim must be filed within three years of the alleged act, omission or neglect.

### B. Civil District Court Suit for Medical Malpractice and Second Exception of Prescription

On November 26, 1996, Jones filed a civil suit for medical malpractice in Civil District Court for the Parish of Orleans with Scottsdale's approval. By correspondence dated July 21, 1997, Jones informed a new Scottsdale adjuster, Ms. Mara Gilson, that McCahill was now claiming that McCahill's treating physician, Dr. Ken Adatto ("Dr. Adatto"), had told him during one of his early visits that the Charity Hospital physicians did not properly set his ankle at the time of the March 2, 1992 surgery. (*See*, July 21, 1997 letter from Scott Jones to Mara Gilson, Exhibit "K" to Scottsdale's Motion for Summary Judgment). In addition, McCahill claimed that Dr. John Burvant ("Dr. Burvant"), the physician who performed the original surgical repair of McCahill's ankle, had made the statement to McCahill several months after the initial March 2, 1992 surgery that a mistake had been made during the surgery. Upon inquiry, both physicians specifically denied ever having made any such statements to McCahill. (Exhibit 1, pp. 91-95, and December 5, 1997 letter from Scott Jones to Ken Fulgenzi, Exhibit "L" to Scottsdale's Motion for Summary Judgment).

During the latter part of 1998 and the beginning of 1999, McCahill became increasingly uncooperative. He had apparently spent the entirety of the settlement received from the *McCahill v Scottsdale* matter and was desperate for money. He wanted to settle the medical malpractice action, receive his portion of the settlement funds and have the matter concluded. (Exhibit 1, pp. 108-109). On February 17, 1999, Jones wrote to Ken Fulgenzi, the next Scottsdale adjuster, to advise him of McCahill's repeated requests that the matter be settled for the amount of the medicals, or approximately $38,000.00. Jones recommended settling for this amount "[i]n light of Mr.

McCahill's questionable character ... ." Beth Brezinski, the next Scottsdale adjuster, rejected this recommendation.

On July 16, 1999, the State filed a second Exception of Prescription, this time in Civil District Court for the Parish of Orleans. Again, Jones sent a copy of the State's Exception of Prescription to Scottsdale. In support of its Exception, the State stated that McCahill was treated at Charity Hospital from February 29, 1992 through April 10, 1994. It argued that it was not "reasonable" for McCahill not to have "discovered" the alleged malpractice during the course of his treatment. The State primarily relied on a statement McCahill allegedly made on April 22, 1993, during therapy, wherein he allegedly stated that he knew he was going to lose his leg. The State concluded by arguing that McCahill had the constructive knowledge necessary to start the running of prescription at that time or, at the very latest, April 10, 1994, when the amputation occurred.

### i. The McCahill Affidavit

The hearing on the Exception was originally set for August 27, 1999, but Jones requested a continuance in order to prepare an Opposition. Thereafter, Jones personally met with McCahill in connection with the preparation of an Opposition to the State's Exception of Prescription. (Exhibit 1, pp. 137-142). Jones traveled to McCahill's home and asked him point blank, despite the alleged statements made by Drs. Adatto and Burvant, if he believed there had been adequate care by the Charity Hospital physicians in 1992. (Exhibit 1, p. 138). McCahill confirmed to Jones that, despite these physician statements, he did not feel there was malpractice by the Charity Hospital physicians until Jones spoke to him in July of 1994. (Exhibit 1, p. 139). Based upon this information, Jones felt it appropriate to have McCahill sign an affidavit stating that he was unaware

of any malpractice until July 21, 1994, when he was informed by Jones that there may have been negligence on the part of the Charity Hospital physicians. (Exhibit 1, p. 140). This Affidavit was filed in support of the Opposition to the State's Exception. (*See*, Affidavit of Van Lauren McCahill, Exhibit "T" to Scottsdale's Motion for Summary Judgment).[4]

### C.   Jones Withdraws As Counsel for Scottsdale

Subsequently, McCahill began to insist that they take the State's most recent offer to settle for $15,000.00. He then offered to take $3,750.00 (his percentage under the Litigation Agreement of $15,000.00) and walk away. When Jones told McCahill that Scottsdale did not appear to be interested in such a scenario, McCahill told Jones that, in light of Scottsdale's lack of cooperation, he would "say some things" that could damage or sabotage the medical malpractice case. (Exhibit 1, p. 145). On October 12, 1999, Jones wrote to Brezinski informing her of McCahill's position and informing her that, if no settlement could be reached, he would be forced to withdraw from representing McCahill and Scottsdale in light of the conflict that had arisen between them. On October 14, 1999, Jones withdrew as counsel of record.

---

[4]In a recent deposition McCahill testified that the information contained in the Affidavit was inaccurate. According to McCahill he was aware of medical malpractice as early as early 1993. Of course, such knowledge would have commenced the prescriptive period, requiring any medical malpractice suit to be filed by early 1994. As indicated above, Jones did not become involved in the McCahill v. Scottsdale matter until June 1994.

-8-

### 3. Scottsdale Withdraws Opposition to State of Louisiana's Exception of Prescription

On October 22, 1999, Mark Ross ("Ross") was substituted as the attorney for Scottsdale. On January 6, 2000, Ross filed an Amended Response to the State's Exception of Prescription, withdrawing Scottsdale's Opposition.[5]

Meanwhile, Ross drafted a proposed Receipt, Release and Assignment of Rights to be executed by and between McCahill, Charity Hospital and Scottsdale. According to the terms of the Receipt, Release and Assignment of Rights, McCahill was to dismiss his claim against Charity Hospital and receive $15,000.00. In consideration of receiving Scottsdale's consent to his receiving one hundred percent of the $15,000.00 in settlement, McCahill was to assign his rights to Scottsdale in any claim for legal malpractice against Jones and H & W. Further, McCahill was to cooperate in prosecuting the legal malpractice claim.[6]

A hearing on the State's Exception of Prescription was held on January 21, 2000. In light of the withdrawal of opposition the Court entered Judgment dismissing Scottsdale's claim.

---

[5] In its Memorandum in Support of its Motion for Summary Judgment, Scottsdale states that the withdrawal of the opposition to the State of Louisiana's Exception of Prescription was done after a review of the file by Scottsdale's present counsel, Mark Ross, whereupon Mr. Ross apparently "determined that defendants had not only caused Scottsdale's medical malpractice case to prescribe, but also failed to disclose and even concealed the facts surrounding the prescription of Scottsdale's claim." (Memorandum in Support of Scottsdale's Motion for Summary Judgment, p. 6). Mr. Ross's "determinations" and his decision to withdraw any opposition to the State of Louisiana's Exception was the basis for Defendants' Motion to Disqualify Plaintiff's Counsel which was denied by this Court. Now, by his own admission Mr. Ross is a necessary witness to a contested issue in the present litigation.

[6] According to Brezinski, Scottsdale gave McCahill the entire $15,000.00 because he was "kind of shaky" about whether he was going to support Scottsdale's case. She believed that giving him the $15,000.00 was a way to ensure his help in the future, if they could locate him. (Excerpts of Deposition of Beth Brezinski, attached hereto as Exhibit "2", p. 68 and 69).


4.  **The Legal Malpractice Action**

Scottsdale's action for legal malpractice against Jones and H & W was filed January 25, 2000. The basis for all the allegations made in Scottsdale's Complaint is that Jones allowed Scottsdale's medical malpractice claim to prescribe when he did not file within a year of the date of McCahill's April 10, 1994 amputation, or by April 10, 1995.

C.  **LAW AND ARGUMENT**

1.  **Motion for Summary Judgment is Not Appropriate as a Matter of Law**

Scottsdale apparently seeks a judgment akin to an advisory opinion or declaratory judgment simply stating that the filing of a false affidavit is legal malpractice as a matter of law. Assuming for a moment that Scottsdale can prove the facts necessary to support such a theory, which is specifically denied, Scottsdale fails to allege all the necessary elements of a claim for legal malpractice. Under Louisiana law, to state a claim for legal malpractice plaintiffs must allege and prove by a preponderance of the evidence that: (1) there was an attorney client relationship, (2) that the attorney was negligent in his representation of the client, and (3) that this negligence caused the plaintiff some corresponding loss. *Evans v. Detweiler*, 466 So.2d 800 (La. App. 4th Cir. 1985); *Greyhound Lines, Inc. v. Levy*, 1988 U.S. Dist. LEXIS 13511 (E.D. La. 1988); *Prestage v Clark*, 97-0524 (La. App. 1st Cir. 12/28/98); 723 So.2d 1086. By simply seeking a ruling that the filing of an allegedly false affidavit is malpractice, Scottsdale has failed to allege, much less prove, the existence of causation and/or damages. Without these essential elements, Scottsdale has not alleged a claim for legal malpractice and its Motion for Summary Judgment That Filing of False Affidavit is Legal Malpractice as a Matter of Law fails.

2.  **There Are Genuine Issues of Material Fact Which Preclude Judgment as a Matter of Law**

A motion for summary judgment is proper where there are no genuine issues of material fact and the only issues to be decided are issues of law. Fed. R. Civ. Pro. 56, *Neff v. American Dairy Queen Corp.*, 58 F.3d 1063 (5th Cir. 1995), *cert. denied*, 516 U.S. 1045 (1996), *Simmons v. McGuffey Nursing Home, Inc.*, 619 F.2d 369 (1980). Here, there are genuine issues of fact which preclude summary judgment in Scottsdale's favor on this isolated issue. First, Scottsdale presumes that the McCahill Affidavit is false and that McCahill "discovered" a claim for medical malpractice prior to the July 21, 1994 settlement conference. However, Jones has testified that when he first discussed the possibility of filing a medical malpractice claim against Charity Hospital with McCahill and McCahill's attorney in the *McCahill v. Scottsdale* matter, Mr. Michael Hingle ("Hingle") at the July 21, 1994 settlement conference, neither McCahill nor Hingle stated to Jones that they had considered the possibility of medical malpractice prior to this date. (*See*, Exhibit 1, pp. 22-24, pp. 89-90). It was not until 1997 when McCahill began telling Jones that Drs. Adatto and Burvant had made statements in 1992 or 1993 about deviations below the standard of care by the Charity Hospital physicians. (Excerpts of Deposition of Van McCahill taken December 15, 2000, attached hereto as Exhibit 3, pp. 22 through 32). However, both of these physicians denied making any such statements when Jones asked each directly about same. (*See*, December 5, 1997 letter from Jones to Fulgenzi, Exhibit "L" to Scottsdale's Motion for Summary Judgment). Furthermore, when Jones asked McCahill in September of 1999 whether he could sign an Affidavit in all truthfulness stating that he became aware that there may have been negligence on the part of various Charity Hospital physicians on July 21, 1994, McCahill said "yes." (Exhibit 1, p. 139). Thus, in September

1999 when the Affidavit was executed, Jones had McCahill confirm the contents of the Affidavit. There is no evidence that McCahill was "induced" as Scottsdale to sign the Affidavit now alleges or that Jones did not have reason to believe that what McCahill was telling him in September of 1999 was not truthful. As this Court has already found in response to Scottsdale's prior Motion for Summary Judgment on Issue of Liability, when McCahill discovered the malpractice remains a contested issue of material fact. (Order and Reasons dated September 29, 2000, p. 11).

3.  **Scottsdale's Theory of Liability States That Scottsdale's Medical Malpractice Claim Prescribed Prior to Jones Being Retained to Represent Scottsdale**

Scottsdale's theory of liability asserted in its Motion for Summary Judgment That Filing of False Affidavit is Legal Malpractice as a Matter of Law turns on the assumption that McCahill did indeed know of a claim for medical malpractice when Drs. Adatto and Burvant allegedly told him of a deviation below the standard of care by the Charity Hospital physicians. In support of this assumption Scottsdale attaches the recent deposition testimony of McCahill taken December 15, 2000, in the above-captioned matter. In that deposition testimony, McCahill stated that the alleged statements by Drs. Adatto and Burvant took place in 1992 or 1993. (*See*, Exhibit 3, pp. 22 through 24). Thus, Scottsdale is apparently now contending that McCahill "discovered" a claim for medical malpractice in 1992 or the "middle part of" 1993. *Id.* Jones did not begin representing Scottsdale until June 24, 1994. (*See*, Short and Concise Statement of Material Facts as to Which Scottsdale Insurance Company Contends There is no Genuine Issue to be Tried). Thus, according to

Scottsdale's own assertions, the claim for medical malpractice more than likely prescribed prior to Jones being retained to represent Scottsdale.[7]

## CONCLUSION

Scottsdale's Motion for Summary Judgment That Filing of False Affidavit is Legal Malpractice as a Matter of Law fails as a matter of law. To begin with, it asks the Court to find that the filing of an allegedly false affidavit is legal malpractice without alleging or proving all of the essential elements of a claim for legal malpractice under Louisiana law. Secondly, as this Court has found previously, there are genuine issues of material fact as to when McCahill "discovered" a claim for medical malpractice. Thus, Scottsdale relies on a flawed assumption that McCahill's Affidavit at issue is false and that Jones had reason to believe that it was false. Finally, if Scottsdale's present assertions that McCahill knew of medical malpractice in 1992 or 1993 are deemed the truth, then Scottsdale's claim for medical malpractice prescribed prior to Jones being retained to represent Scottsdale. Accordingly, Motion for Summary Judgment That Filing of False Affidavit is Legal Malpractice as a Matter of Law should now be DENIED.

---

[7] This Court has already observed that Scottsdale has previously cited to evidence that indicates that McCahill has stated he learned of medical malpractice as early as March 1992, more than one year prior to Jones being retained to represent Scottsdale. (Opinion and Reasons dated September 29, 2000, p. 11, fn #4).

Respectfully Submitted,

*[signature: Margaret Sunkel]*

WILLIAM E. WRIGHT, JR. (#8564)
MARGARET L. SUNKEL (#25888)
DEUTSCH, KERRIGAN & STILES, L.L.P.
755 Magazine St.
New Orleans, Louisiana 70130-3672
Telephone: (504) 581-5141
Attorneys for Scott G. Jones and Hulse
& Wanek, PLC

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing pleading has been served on all parties through their counsel of record, by placing same in the United States mail, postage prepaid and properly addressed, this 16th day of January, 2000.

*[signature: Margaret Sunkel]*

MARGARET L. SUNKEL

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| SCOTTSDALE INSURANCE COMPANY | * | CIVIL ACTION NO. 00-0225 |
| VERSUS | * | SECTION "F" |
| SCOTT G. JONES, ESQ., HULSE AND WANEK, PLC AND XYZ INSURANCE COMPANY | * | MAGISTRATE (4) |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### STATEMENT OF MATERIAL FACTS
### AS TO WHICH THERE EXISTS A GENUINE ISSUE TO BE TRIED

**NOW COME** defendants Scott G. Jones ("Jones") and the law firm of Hulse & Wanek, PLC ("H & W") (collectively "Defendants"), and in conformance with Local Civil Rule 56.2, offer this Statement of Material Facts as to Which There Exists a Genuine Issue to be Tried in order to traverse Scottsdale Insurance Company's ("Scottsdale") Short and Concise Statement of Material Facts as to Which Scottsdale Insurance Company Contends There is no Genuine Issue to be Tried:

**Number 2:**

Scottsdale makes an assumption as to the medical cause for the infection and chronic osteomylitis which Van Lauren McCahill ("McCahill") was diagnosed in March of 1994.

Defendants take issue with this assertion as there has been no evidence offered as to what, in fact, was the cause of McCahill's medical problems.

**Number 4:**

At the July 21, 1994, settlement conference in the *McCahill v. Scottsdale* matter, Jones, McCahill and McCahill's attorney, Michael Hingle ("Hingle"), discussed the possibility of filing a medical malpractice claim against Charity Hospital. Jones testified in his deposition that both McCahill and Hingle did not say anything in response to Jones' statements that he had met with a Dr. Vrahas who had indicated that McCahill's treatment rendered by Charity Hospital may have been treatment below the standard of care. (*See*, Deposition of Scott Jones, pp. 22 through 24). Jones further stated that there was even an indication that both McCahill and Hingle were surprised. (*See*, Deposition of Scott Jones, p. 89). Hingle eventually said they would consider the possibility of filing an action for medical malpractice. (*See*, Deposition of Scott Jones, p. 24).

**Numbers 6 through 9:**

In Paragraphs 6 through 9, Scottsdale makes the incorrect assumption that Scottsdale's medical malpractice action prescribed on April 10, 1995. This is incorrect. While Jones did at one point make that statement in correspondence to Deborah G. Gildener that Scottsdale "may only have until April 10, 1995" (a year from the date of amputation) to file its claim for medical malpractice, this statement was made not as an evaluation of the prescriptive date, but rather to stress to Ms. Gildener the necessity of her timely response. Jones testified that, in fact, the operative date he was working with for purposes of prescription was the date McCahill "discovered" the alleged medical malpractice, which he believed to July 21, 1994, the date of the settlement conference in the

*McCahill v. Scottsdale* matter. Accordingly, he reasonably believed that the whether the Petition invoking a Medical Review Panel was filed in April or May of 1995 was not fatal to the medical malpractice action. (*See*, Deposition of Scott Jones, pp. 66 and 67).

**Number 12:**

Mr. Jones' December 5, 1997 letter goes on to state that both Dr. Adatto and Dr. Burvant specifically denied ever making such statements to Mr. McCahill.

**Numbers 16 and 17:**

Scottsdale contends that Jones made misrepresentations by filing the Affidavit of McCahill in opposition to the State's Exception of Prescription. However, Jones testified that upon the State's filing of the Exception of Prescription, he traveled to McCahill's home and asked him point blank, despite the alleged statements made by Drs. Adatto and Burvant, if McCahill believed that there had been adequate care by the Charity Hospital physicians in 1992. (*See*, Deposition of Scott Jones, p. 138). McCahill confirmed to Jones that, despite these physicians' statements, he did not feel there was malpractice by the Charity Hospital physicians until Jones spoke to him in July of 1994 when he was informed by Jones that there may have been negligence on the part of Charity Hospital physicians. (*See*, Deposition of Scott Jones, p. 139). Based on this information, Jones felt it was appropriate to have McCahill sign the affidavit stating that he was unaware of any malpractice until July 21, 1994. (*See*, Deposition of Scott Jones, p. 140).

**Number 18:**

While it is true that Mr. McCahill testified in deposition that he was unaware of the State of Louisiana's Exception of Prescription until "the first part" of 1999, this statement is directly

contradicted by correspondence in 1996 from Mr. Jones to Mr. McCahill discussing the State of Louisiana' Exception. Conveniently, Mr. McCahill denies ever receiving the 1996 correspondence. (*See*, December 15, 2000 Deposition of Van McCahill, pp. 38-47 and Exhibits 5, 6 and 7 thereto).

**Number 21:**

Obviously, as the Court has already found, there is a genuine issue of material fact as to when Mr. McCahill "discovered" the alleged medical malpractice. Scottsdale has again altered its position to argue that Mr. McCahill discovered the alleged malpractice when he was informed by Drs. Adatto and/or Burvant in 1992 or 1993. However, both Dr. Adatto and Burvant specifically denied ever making such statements to Mr. McCahill. Further, Mr. Jones testified that upon the State's filing of the Exception of Prescription, he traveled to McCahill's home and asked Mr. McCahill point blank, despite the alleged statements made by Drs. Adatto and Burvant, if McCahill believed that there had been adequate care by the Charity Hospital physicians in 1992. (*See*, Deposition of Scott Jones, p. 138). McCahill confirmed to Jones that, despite these physicians' statements, he did not feel there was malpractice by the Charity Hospital physicians until Jones spoke to him in July of 1994 when he was informed by Jones that there may have been negligence on the part of Charity Hospital physicians.

**Number 22:**

Scottsdale's statement makes several unproven assumptions. First, Scottsdale assumes that Mr. McCahill was informed of medical malpractice by Drs. Adatto and Burvant. Second, Scottsdale assumes that Mr. Jones had reason to believe that the Affidavit signed by Mr. McCahill was untrue. Mr. Jones testified that he asked Mr. McCahill to tell him what the truth was and whether he could

sign the Affidavit "in all truthfulness." At a meeting with Mr. Jones, Mr. McCahill stated that what was in the affidavit was the truth and signed the Affidavit. (*See*, Deposition of Scott Jones, pp. 138 through 140).

**Respectfully Submitted,**

WILLIAM E. WRIGHT, JR.  (#8564)
MARGARET L. SUNKEL (#25888)
**DEUTSCH, KERRIGAN & STILES, L.L.P.**
**755 Magazine St.**
**New Orleans, Louisiana  70130-3672**
**Telephone:  (504) 581-5141**
**Attorneys for Scott G. Jones and Hulse**
**& Wanek, PLC**

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing pleading has been served on all parties through their counsel of record, by facsimile and by sending via Federal Express, postage prepaid, and properly addressed, this 16th day of January, 2001.

SEE RECORD FOR
EXHIBITS
OR
ATTACHMENTS
NOT SCANNED